**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: April 1 2022**

_Mary Ann Whipple_
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 11-33801 |
| | ) | |
| Bonnie Sue Ostrander | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | Hon. Mary Ann Whipple |
| | ) | |

### <u>MEMORANDUM OF DECISION ON DEBTOR'S MOTION FOR CONTEMPT</u>

This case is before the court on Debtor's Motion for Contempt Against Thomas Pigott, Esq. and Pigott, Ltd., [Doc. # 103], and the Response of Thomas Pigott, Esq. and Pigott, Ltd. (together "Respondents"), [Doc # 106]. The court held an evidentiary hearing on the motion that Debtor, her counsel and Thomas Pigott attended virtually[1] and at which the parties presented testimony and other evidence.

The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings relating to adjustment of the debtor-creditor relationship, such as enforcement of the Chapter 7 discharge and this court's own orders, are core proceedings that this court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(O); *see* 28 U.S.C. § 157(b)(2)(J).

---

[1] Due to the COVID-19 public health emergency, and the status of the pandemic in Lucas County and the State of Ohio, the court issued a Supplemental Procedures Order directing the procedures for a virtual evidentiary hearing. [Doc. # 131].

This memorandum of decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 9014(c) and 7052. Regardless of whether specifically referred to in this memorandum of decision, the court has examined the submitted materials, weighed the credibility of the hearing witnesses, considered all of the evidence, and reviewed the entire docket and record of Debtor's Chapter 7 case, related bankruptcy cases and public records of the Lucas County, Ohio Court of Common Pleas.[2] Based upon that review and for the reasons stated below, the court finds the Debtor's Motion for Contempt is without merit.

## I. BACKGRIOUND

Attorney Thomas Pigott ("Pigott") and his law firm Pigott, Ltd. represented Stone Oak Investments, LLC, and perhaps also Bonnie Ostrander ("Ostrander" or "Debtor") and Stone Oak Market, Inc., into early 2011 on business matters involving ownership and operation of a convenience store and gas station known as Stone Oak Market. There is no dispute that Ostrander was the sole member and shareholder, respectively, of the entities and was responsible for their decision-making and operations at all relevant times. But the business operations ended up mired in litigation over improvements and an attempted expansion that were unsuccessful. The business closed and the real estate on which it operated was eventually sold through a state court receivership sale.

As business operations struggled, amounts owed to Pigott, Ltd. for legal services rendered over the years had not been fully paid. Pigott knew the business was having trouble paying its creditors, including Pigott, Ltd. To enhance its own prospects for payment of its outstanding invoices, Pigott, Ltd. prepared for its client(s) a promissory note to be secured by mortgages on certain real property not subject to the receivership. Pigott did not recall at the hearing whether his law firm had a written fee agreement but did not think there was one.

A promissory note dated January 18, 2011, in the amount of $23,714.85 was entered into between Ostrander, Stone Oak Market, Inc., Stone Oak Investments, LLC (all as "Maker") and Pigott, Ltd. [Dor Ex. 1 (Ex. A thereto)]. Ostrander signed this promissory note "in her individual capacity and as Managing and Sole Member of Stone Oak Investments, LLC and as President and Sole Shareholder of Stone Oak

---

[2] The court takes judicial notice of the contents of its case dockets. Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1171-72 (10th Cir. 1979) (stating that judicial notice is particularly applicable to the court's own records of litigation closely related to the case before it); *United States v. Brugnara*, 856 F.3d 1198, 1209 (9th Cir. 2017) (stating that district court may properly take judicial notice of its own records). It may also take judicial notice of state court records. *See Robinson v. Woods*, 901 F.3d 710, 712, n.1 (6th Cir. 2018).

2

Market, Inc." [*Id*.]. Although bearing the date January 18, 2011, Ostrander recalls that she actually signed the note on July 10, 2011, which was just before she filed this Chapter 7 case.

At the same time, Ostrander executed a mortgage on real property located at 9136 Angola Road in Holland, Ohio. [Dor Ex. 1 (Ex. D thereto)]. This parcel was adjacent to the former convenience store but not included in the receivership sale because there was no mortgage on it. The Mortgagor on the document is Stone Oak Investments, LLC. Prior to Ostrander's signature is the typed title **"STONE OAK INVESTMENTS, LLC:.**" The typed word "BY:" precedes her signature and the typed designation "Bonnie Ostrander, Managing and Sole Member" is under her signature. [*Id*.].

On the same day Ostrander also executed as Mortgagor an open-end mortgage on real property at 1120 S. Raab Road in Swanton, Ohio. [Dor Ex. 1 (Ex. C thereto)]. Under her signature on this mortgage, Ostrander's designation is simply "Bonnie Ostrander." [*Id*.].

Respondent Pigott, Ltd. was Mortgagee on both open-end mortgages.

There is no dispute that Pigott drafted the promissory note and the two mortgages for Pigott, Ltd.'s client(s) to sign in its favor. For her part, Ostrander believably says that she signed what Pigott presented to her to sign and that she signed them because he asked her to do so.

On July 12, 2011, Ostrander filed a Chapter 7 petition in this court, Case No. 11-33801. Attorney Steve Diller ["Diller"] represented her in this case at filing.[3] In her Schedule F, Debtor listed Pigott, Ltd. as an unsecured, nonpriority creditor for a debt of $26,733.02. [Doc. # 12, p. 16/44]. Debtor, in Schedule B, listed as assets her interests (and values) in Stone Oak Market, Inc. ($0) and Stone Oak Investments, LLC ($135,000.00). [*Id*. at p. 5/44]. This case was first administratively closed on January 15, 2013. [Doc. # 91].

The deadline for creditors to file claims in this case was December 21, 2011. [Doc. # 15-1]. On October 25, 2011, Pigott, Ltd. filed a general unsecured claim for $29,349.53. [Claim 8-1]. While initially vague as to whether he was aware of Ostrander's bankruptcy filing in the early December 2011 time frame, Pigott acknowledges that he must have been aware of it by October 25, 2011, to have filed the proof of claim. He attached a statement to the proof of claim, showing a beginning balance as of June 13, 2007, of $23,832.50, and charges and credits running through July 2011, with the ending balance of $29,349.53 as set forth in the proof of claim. It is directed only to Bonnie Ostrander and Stone Oak Investments, LLC.

---

[3] Diller does not represent Debtor in this case now.

A different Pigott, Ltd. "A/R Transaction Listing" is attached to its state court complaint. [Dor Ex. 1 (exhibit I thereto)]. It starts June 13, 2007 and ends November 13, 2019. It specifies Stone Oak, Investments, LLC as its client. It shows amounts of invoices for services through August 5, 2011. Thereafter, it shows five invoices at differing intervals through November 13, 2019, for what appears to be compound interest on the unpaid account balance. It also shows that payments were made regularly until April 25, 2011. Four payments were made in 2011 after the date on Pigott, Ltd.'s promissory note. The payments made in 2011 totaled $5,000.00, with the last payment made on April 25, 2011, in the amount of $2,000.00.

Debtor received her Chapter 7 discharge in this case on November 10, 2011, and all creditors, including Pigott, Ltd., were contemporaneously provided notice of same. [Doc. ## 42, 45]. Pigott, Ltd. did not file an adversary proceeding seeking to have Ostrander's debt to him declared nondischargeable as within the scope of 11 U.S.C. § 523(a)(2)(fraud), (4)(fraud or defalcation in a fiduciary capacity, embezzlement, larceny), or (6)(willful and malicious conduct). There were no objections to Ostrander's discharge and there were no dischargeability actions filed.

On December 5, 2011, Pigott e-mailed another lawyer, Bertram Puligandla ("Puligandla"), to address an apparent request from Ostrander regarding another, unrelated document. [Resp. Ex. C, p.1]. Pigott also references in his e-mail as attached the mortgages she previously executed and indicated to the lawyer that "I will be filing this tomorrow unless I hear otherwise from you." [*Id.*]. Pigott filed the mortgages post-petition with the Lucas County Recorder on December 6, 2011, at approximately 1:24 p.m., per the Recorder's office time-stamps. [Dor Ex.1 (Exs. C and D thereto)].

As to the 9136 Angola Road real property and mortgage, on August 27, 2013, the Lucas County Treasurer commenced a tax foreclosure action in the common pleas court against Stone Oak Investments, LLC. [Dor Ex 1, ¶ 39]. Pigott, Ltd. was also a party in that action because of its recorded mortgage interest in the property. It filed a cross-claim against Stone Oak Investments, LLC seeking both foreclosure of its mortgage on 9136 Angola Road and a money judgment for the unpaid legal fees. [Doc. # 106, Ex. F]. On November 14, 2014, the common pleas court entered in the tax foreclosure action a consent judgement in favor of Pigott, Ltd., represented by Pigott, and against Stone Oak Investments, LLC, represented by Diller, including a money judgment in the amount of $48,218.77. [Doc. # 106, Ex. G]. Pigott, Ltd. eventually obtained a certificate of judgment on the consent money judgment on December 14, 2016. [Dor Ex. 1, ¶ 45 (Ex. E thereto)].

4

As to the 1120 S. Raab Road real property, Pigott figured out that he listed the wrong Mortgagor on the Pigott, Ltd. mortgage in what he calls a "scrivener's error." [Resp. Ex. C, p. 3]. Pigott having drafted the mortgage identifying Ostrander as Mortgagor instead of the owner of the property, Stone Oak Investments, LLC, he was the "scrivener." [*Id*.]. At the hearing, he testified that he did not recall when he discovered that the 1120 S. Raab Road mortgage named the wrong Mortgagor. But on December 6, 2011, Piggott raised the incorrect Mortgagor issue with Puligandla. Pigott's e-mail, sent on December 6, 2011, said that on his return, which the court infers as being from the county recorder's office, "I discovered that there is an error with the 1120 S. Raab Road mortgage, a scrivener's error." [*Id*.]. He stated that the wrong Mortgagor was identified on and executed the document and that "I have attached a corrected mortgage. Please have Bonnie sign it and get it back to me so I can get it filed." [*Id*.]. That never happened.

Instead, Pigott received a letter dated March 30, 2012, from Ostrander's bankruptcy lawyer Diller. Diller advised Pigott that the post-petition and post-discharge recording of the two mortgages in December 2011, violated Ostrander's Chapter 7 discharge in this case. [Doc. # 106, Ex. D, p. 2]. Diller's letter requested that the mortgages be released by April 4, 2012, absent which he stated he would advise Debtor to initiate an adversary proceeding for violation of the discharge injunction. [*Id*.].

In an e-mailed letter to Diller dated April 3, 2012, Pigott responded and explained his "scrivener's error" regarding the mortgage. Pigott stated that the property located at 1120 S. Raab Road was owned, according to the county auditor's website, by Stone Oak Investments, LLC and that the referenced mortgage incorrectly identified Ostrander as Mortgagor instead of the entity. Pigott also stated "I fully understand and appreciate that Ms. Ostrander's personal debt to me was discharged in her bankruptcy proceeding. That does not mean that her entities no longer owe my office's fees." [Doc. # 106, Ex. E, p. 4/13].[4] Still, the corrected mortgage was never signed and returned to Pigott.

On June 12, 2014, Stone Oak Investments, LLC sold the real property at 1120 S. Raab Road to Defendant Michael Hartsell ("Hartsell") for $32,240.80. Hartsell was involved in Ostrander's establishment and operation of a new convenience store not far from the failed one. Defendant Farmers & Merchants Bank financed Hartsell's acquisition of the property. The disposition of the proceeds of the sale is a material issue in Pigott, Ltd.'s pending state court lawsuit, which is central to Ostrander's allegations of contempt. At the time of sale, Piggott, Ltd.'s defective mortgage did not encumber the property because of Pigott's mistake in identifying Ostrander as Mortgagor. Nor did Pigott Ltd. have at

---

[4] Pigott's understanding on this point is correct as a matter of law. 11 U.S.C. § 524(e).

the time of sale a judgment lien on the 1120 S. Raab Road property. Its consent judgment against Stone Oak Investments, LLC was not entered until November 14, 2014, and the certificate of judgment on the consent judgment was not issued until December 14, 2016.[5]

There were additional related bankruptcy cases filed in this court.

On November 6, 2012, following her Chapter 7 discharge in this case, Debtor commenced a separate Chapter 13 case. [Case No. 12-35046-ssj]. Diller also represented her in that case. Pigott, Ltd. was not scheduled as a creditor of Ostrander's in that case. On July 22, 2013, the court granted the Chapter 13 Trustee's motion to dismiss it because Ostrander could not propose a feasible Chapter 13 plan. [*Id*. at Doc. # 180].

Subsequently, on March 25, 2014, again represented by Diller, Debtor filed another Chapter 13 case. [Case No. 14-30994-maw]. Debtor's Plan in that second Chapter 13 case was confirmed and completed and the final decree issued on September 7, 2016. [*Id*. at Doc. # 153]. However, Ostrander did not receive a discharge because she was ineligible for one as a result of the timing of and discharge in this case. 11 U.S.C. § 1328(f)(1). Pigott, Ltd. was not listed as a creditor in Ostrander's second Chapter 13 case.

On February 11, 2015, Stone Oak Investments, LLC, represented by Diller, filed a voluntary Chapter 11 case in this court. [Case No. 15-30316-maw]. Pigott, Ltd. filed a secured claim in the consent judgment amount of $48,218.77, attaching the consent judgment, the note, the mortgage on the 9136 Angola Road property and an invoice claiming interest on the debt. [*Id*. at Claim 4-1]. The 2015 Chapter 11 case was dismissed on December 9, 2016, without confirmation of a plan of reorganization. [*Id*. at Doc. # 129].

On June 1, 2017, Stone Oak Investments, LLC, represented by Diller, filed a second voluntary Chapter 11 case in this court. [Case No. 17-31741-maw]. Pigott, Ltd. filed a secured claim on the consent judgment of $72,497.25, attaching the consent judgment, the note, the mortgage on the 9136 Angola Road

---

[5] Under Ohio law, entry of a money judgment does not standing alone constitute a judgment lien on property. *In re Helligrath*, 569 B.R. 709, 713-14 (Bankr. S.D. Ohio 2017). Although liens can be created in other ways, generally a judgment lien arises on "lands and tenements of each judgment debtor within any county of this state from the time there is filed in the office of the clerk of the court of common pleas of such county a certificate of such judgment….'" Ohio Rev. Code § 2329.02; *In re Davis*, 539 B.R. 334, 341 (Bankr. S.D. Ohio 2015). A judgment does not attach as a lien to "[g]oods and chattels of a judgment debtor" until they are "seized in execution." Ohio Rev. Code § 2329.03. Respondents' statement in paragraph 46 of the state court complaint that "[t]he Pigott [Judgment] Lien is unsatisfied and constitutes a valid and existing lien and encumbrance against Stone Oak Investments" is misleading at best. A judgment lien does not attach to and become a "valid" lien or encumbrance against an entity or a person as such. Rather, it attaches to and becomes a judgment lien on specific property of the judgment debtor only as and when provided by Ohio law. *See Verba v. Ohio Cas. Ins. Co.*, 851 F.2d 811, 814 (6th Cir. 1988).

property and an invoice claiming more interest on the debt. [*Id.* at Claim 2-1]. The 2017 Chapter 11 case was dismissed on April 4, 2018, without confirmation of a plan of reorganization. [*Id.* at Doc. # 80].

In June 2018, Pigott, Ltd., represented by Pigott, commenced litigation in the Lucas County, Ohio Court of Common Pleas against a number of parties including Stone Oak Market, Inc., Stone Oak Marketplace, LLC, Stone Oak Investments, LLC, and Ostrander. [Civil Case No. CI0201802725]. Hartsell and Farmers & Merchants Bank were also joined as defendants, alleged to be involved with Ostrander's ongoing establishment and operation through various entities of the second convenience store. Pigott, Ltd. voluntarily dismissed that complaint without prejudice on March 7, 2019, Pigott stating at the hearing that he did not remember why it did so.

Approximately eight months later, on November 13, 2019, Pigott, Ltd., again represented by Pigott, refiled the state court litigation. Contained in both complaints is the following statement:

> Nothing herein shall be construed or interpreted as Plaintiff's intent or attempt to collect upon the Promissory Note, or under any other legal theory or obligation related thereto, as to Defendant Bonnie Ostrander individually, as said Defendant was provided a discharge on or about 1/15/2013 in U.S. Bankruptcy Court, Northern District of Ohio, Chapter 7, Case No. 11-33801-rls proceeding discharging her of such specific purported indebtedness to Plaintiff.

[Dor Ex. 1, ¶ 12; Doc. # 106, Ex. I, ¶ 9].

Debtor moved to reopen this Chapter 7 case to seek contempt sanctions against Pigott and Pigott, Ltd. [Doc # 92]. The court granted the motion to reopen, [Doc. # 101], and Debtor filed her motion for contempt against them as Respondents, [Doc. # 103].

Ostrander contends that a number of actions of Pigott and Pigott, Ltd., but primarily the state court litigation, violate her discharge in this Chapter 7 case. The prayer for relief in her motion lists the following additional actions as violating the discharge injunction:

1. Filing an unsecured proof of claim in Debtor Ostrander's Chapter 7 Bankruptcy case number 11-33801 when [Pigott] believed his claims to be secured and in fact pursued his claims post-discharge as secured.

2. The recording of an open-end mortgage on December 6, 2011, signed by Bonnie Ostrander on January 18, 2011 (pre-petition) relative to property located at 1120 S. Raab after the debtor Ostrander was granted a chapter 7 discharge relative to a pre-petition debt.

7

3. The recording of an open-ended mortgage on December 6, 2011, signed by Bonnie Ostrander on January 18, 2011 (pre-petition) relative to property located at 9136 Angola after the debtor Ostrander was granted a chapter 7 discharge with respect to a pre-petition debt.

4. The "provid[ing] of notice to . . . Bonnie Ostrander" on December 6, 2011 "of the scrivener error" on the "deed [sic];"

5. The "provid[ing] of notice to . . . Bonnie Ostrander" on April 3, 2012 "of the scrivener error" on the "deed [sic];"

[Doc. # 103, pp. 8-9].

Respondents, represented by Pigott, filed a timely response opposing the motion for contempt, after which the court conducted the virtual evidentiary hearing.

## II. <u>LAW</u>

### A. <u>The Chapter 7 Discharge Generally</u>

A Chapter 7 discharge "discharges the debtor from all debts that arose before the date of the order for relief under this chapter…" 11 U.S.C. § 727(b). The date of the order for relief in a Chapter 7 case is the date the petition is filed commencing the case, 11 U.S.C. § 301, which was July 12, 2011, in this case.

Section § 524(a) of the Bankruptcy Code describes the effect of a bankruptcy discharge. 11 U.S.C. § 524. Under § 524(a), a discharge order in a bankruptcy case automatically "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor. . . ." 11 U.S.C. § 524(a)(2). Thus, "a discharge will be completely effective and will operate as an injunction against the commencement or continuation of an action or the employment of process to collect or recover a debt as a personal liability of the debtor." 4 COLLIER ON BANKRUPTCY ¶ 524.02 (16th ed.). "The purpose of § 524(a) is to afford a debtor a 'fresh start' by ensuring that a debtor will not be pressured in any way to repay a debt after it has been discharged." *Paglia v. Sky Bank (In re Paglia)*, 302 B.R. 162, 166 (Bankr. W.D. Pa. 2003) (citation omitted); *Ragone v. Stefanik & Christie, LLC* (*In re Ragone*), No. 20-8013, 2021 WL 1923658, *4 (6th Cir. B.A.P., May 13, 2021) (quoting *In Re Paglia*, 302 B.R. at 166)).

The Bankruptcy Code sets structural limits on the scope of the discharge injunction. As will be addressed further, several of these limits come into play in this case.

As stated in § 727(b), only dischargeable debts that arise before the order for relief, which is the date of the filing of the petition, are discharged. In this case, then, only dischargeable debts of Ostrander's that arose before the July 12, 2011, filing date of this case are discharged. While there is no dispute that

8

Ostrander's debt on her account with Piggott, Ltd. and the promissory note arose prior to July 12, 2011, there is an issue whether some of the claims against her now lumped into the state court complaints amount to debts that arose before July 12, 2011.

The types of debts that are listed in § 523(a) of the Bankruptcy Code are excluded from the scope of a debtor's discharge under § 727(a). Some of those types of debts are excluded by operation of the statute without a court determination. Some of them, however, are only excluded from discharge if the bankruptcy court so decides. Specifically, those in § 523(a)(2), (4) or (6) are within the exclusive jurisdiction of the bankruptcy court to determine as nondischargeable in an action brought within the 60-day time frame set forth in § 523(c). There were no actions brought against Ostrander in this case under § 523(c) and it is too late to do so now. *But cf.* 11 U.S.C. § 523(a)(3). As a corollary to the question of when certain claims now advanced by Piggott, Ltd. in the state court complaints arose, there is an issue whether some of them thus should have been the subject of an action brought in this court under § 523(c).

Another limit on the scope of the discharge injunction arises under § 524(a)(2), in that only collection actions seeking to collect the discharged debt as a personal liability of the debtor are enjoined. Valid pre-petition liens that are not avoided during the bankruptcy case ride-through it to remain in effect. *See Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991); *In re Isaacs*, 895 F.3d 904, 913 (6th Cir. 2018). Once the automatic stay is no longer in effect creditors holding valid, un-avoided pre-petition liens are permitted to foreclose on them through *in rem* actions. *In re Isaacs*, 895 F.3d at 914. Although there were other potential problems with its actions in that regard, Piggott, Ltd. asserted it was doing just that on the 1120 S. Raab Road property before Pigott figured out that he drafted the mortgage incorrectly. Otherwise, Piggott, Ltd. did not have any pre-petition liens on Ostrander's property. This limitation is not now an issue with respect to Respondents' alleged violation of the discharge injunction, although there is lawyer confusion evident about this point in the record.

Otherwise dischargeable debts that a debtor reaffirms through the precise statutory process set forth in § 524(c) and (d) and related Bankruptcy Rules are excepted from the scope of a Chapter 7 discharge. Ostrander did not reaffirm any debts in this case, let alone any debt owed to Pigott, Ltd.

Finally, the scope of the discharge injunction is limited by § 524(e), which states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). A debtor's discharge is intended to preserve the debtor's fresh start, but not to provide a shield for third parties liable for the same debts. This principle is often tested in the context of insurers, for example, where courts have decided that § 524(e) permits a creditor to bring or

9

continue an action even directly against the debtor as a nominal defendant in order to establish debtor's liability where that liability is prerequisite to a creditor's recovery from another entity. *E.g.*, *In re Walker*, 927 F.2d 1138, 1142 (10th Cir. 1991). And it is often tested, as here, where litigation is brought both against debtors and other persons liable for a debt, often alleging, also as here, that the post-petition actions at issue are outside the scope of the discharge injunction because they are only brought against third parties. This limit is at issue in this case. Many of the claims in the state court complaints appear to be brought only against third parties. Nevertheless, the question arises whether that is a subterfuge to pressure Ostrander into crying uncle and repaying the discharged debt(s), which Piggott, Ltd. asserts now exceeds $100,000. More to the point, who in this case is using § 524(e) as a shield and who is using § 524(e) as a sword?

### B. Enforcing the Discharge Injunction

There is no private right of action under § 524(a)(2) for violation of the discharge injunction. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 421 (6th Cir. 2000). Rather creditors that violate the discharge injunction of § 524(a) are subject to contempt of the court that issued the discharge order. *In re Orlandi*, 612 B.R. 372, 381 (B.A.P. 6th Cir. 2020)(citing *Pertuso,* 423 F.3d at 423); *Lohmeyer v. Alvin Jewelers (In re Lohmeyer)*, 365 B.R. 746, 749 (Bankr. N.D. Ohio 2007). A debtor may therefore enforce the discharge injunction through traditional contempt proceedings. *Pertuso*, 233 F.3d at 421("[T]he traditional remedy for violation of an injunction lies in contempt proceedings....").

### C. Standard for Finding Contempt of the Discharge Injunction

In *Taggart v. Lorenzen*, _U.S._, 139 S. Ct. 1795 (2019), the Supreme Court decided the standard for determining whether a creditor's actions are in contempt of the discharge injunction. Calling upon "the old soil" of traditional civil contempt principles, the Supreme Court unanimously adopted an objective standard for holding a creditor in contempt of the bankruptcy discharge. Framing this objective standard, the Supreme Court held that, "[a] [bankruptcy] court may hold a creditor in civil contempt for violating a discharge order where there is not a 'fair ground of doubt' as to whether the creditor's conduct might be lawful under the discharge order." *Id*. at 1804. Under *Taggart*, no fair ground of doubt arises "when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order." *Id*. at 1801. Characterizing contempt as a "potent weapon," *id.* (quoting *Longshoremen v. Philadelphia Marine Trade Assn.,* 389 U.S. 64, 76 (1967)), the Supreme Court noted that "[t]his standard reflects that civil contempt is a 'severe remedy', and that the principles of 'basic

fairness require that those enjoined receive explicit notice' of 'what conduct is outlawed' before being held in civil contempt." *Id*. at 1801-02.

Post-*Taggart* other bankruptcy courts have characterized the discharge injunction contempt analysis as a two-step process. *In re Distefano*, 611 B.R. 100, 102 (Bankr. W.D. Mich. 2019); *In re Ragone,* 2021 WL 1923658, *5 (citing and quoting *In re Distefano*, 611 B.R. at 102)). First, the court must decide whether the creditor's actions violated the discharge injunction. Second, the court must undertake the *Taggart* "no fair ground of doubt" inquiry as to violations. *Id.*

*Taggart* does not change the basic analysis whether a discharge violation occurred in the first place. To prove a discharge violation, a debtor must establish that the creditor "(1) has notice of the debtor's discharge . . . ; (2) intends the actions which constitute the violation;[6] and (3) acts in a way that improperly coerces or harasses the debtor." *Bates v. CitiMortgage, Inc.*, 844 F.3d 300, 304 (1st Cir. 2016) (citing *Best v. Nationstar Mortgage LLC,* 540 B.R. 1, 9 (B.A.P. 1st Cir. 2015))(footnote not in original). *Cf. In re Mellem,* 625 B.R. 172, 178 (B.A.P. 9th Cir. 2021) (characterizes two factors of contemnor's knowledge that discharge injunction applied and that contemnor intended the actions that violated the discharge as "movant's threshold burden of going forward."). "The test for whether a creditor's post discharge conduct violates the discharge injunction is '"whether the objective effect of the creditor's action is to pressure a debtor to repay a discharged debt."'" *Lett v. The Bank of New York Mellon (In re Lett),* Case No. 10-61451-BEM, Adv. Pro. No. 20-06278-BEM, 2021 WL 4944094, *8 (Bankr. N.D. Ga., Oct. 22, 2021) (citing *Roth v. Nationstar Mortg., LLC (In re: Roth)*, 935 F.3d 1270, 1276 (11th Cir. 2019)).

Notwithstanding the facial permissibility of a lawsuit or some other action against a discharged debtor, "a violation of § 524(a)(2) may still be found if the debtor proves 'the creditor acted in such a way as to "coerce" or "harass" the debtor improperly,'" in other words "so as to obtain payment of the discharged debt." *Paul v. Iglehart (In re Paul)*, 534 F.3d 1303, 1308 (10th Cir. 2008) (quoting *Pratt v. Gen. Motors Acceptance Corp. (In re Pratt)*, 462 F.3d 14, 19 (1st Cir. 2006)). In turn, "[a]n action is coercive where it is 'tantamount to a threat,'…or places the debtor 'between a rock and hard place' in which he would lose either way." *Lumb v. Cimenian (In re Lumb)*, 401 B.R.1, 7 (1st Cir. B.A.P. 2009) (quoting *Jamo v. Katahdin Fed. Credit Union,* 283 F.3d 392, 402 (1st Cir. 2002)); and citing *Diamond v.*

---

[6] While it is no longer sufficient post-*Taggart* to hold a creditor in contempt only on the basis of notice of the discharge inunction and an intentional act, *In re Orlandi,* 612 B.R. at 382 (post-*Taggart* it is no longer sufficient to hold a creditor in civil contempt by finding that the creditor was aware of the discharge order and intended the actions that violated the order), it is still necessary to make those findings in the court's view. *Cf. In re Ragone,* 2021 WL 1923658, at *8 (dissent cautions against inferring that, actions such as retention of garnished funds in clear violation of the discharge injunction but also in ignorance of it are automatically contemptuous).

11

*Premier Capital, Inc.*, 346 224, 227-28 (1st Cir. 2003) (ultimately meritless lawsuit against discharged debtor's wife stated cause of action for violation of discharge injunction)). Indeed, '[a] creditor's actions may be improperly coercive even in exercising legitimate state rights, if the actions impinge upon 'the important federal interest served by the discharge injunction.'" *Id.* (quoting *In re Pratt*, 462 F.3d at 19).

The movant alleging civil contempt bears the burden of proving by clear and convincing evidence both that the creditor violated the discharge injunction, *Bentley v. OneMain Financial Group, LLC (In re Bentley)*, 2020 WL 3833069 at *4 (6th Cir. B.A.P. 2020), and contempt, *In re City of Detroit, Mich.*, 614 B.R. 255, 265-66 (Bankr. E.D. Mich. 2020); *In re Cantrell*, 605 B.R. 841, 853 (Bankr. W.D. Mich. 2019) (citing *Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998)).

### III. <u>ANALYSIS</u>

The court will first decide whether the actions alleged by Ostrander violate the discharge injunction. Common elements that must be addressed with respect to each of the alleged acts are whether Respondents had notice of the discharge injunction and whether they intended to take the action at issue. The court will then decide whether any act(s) that it determines violate the discharge injunction amount to civil contempt of this court under the *Taggart* "no fair ground of doubt" standard.[7] Finally, if the court decides that Respondents are in contempt, the court must determine an appropriate sanction.

#### A. <u>Did Respondents Violate the Discharge Injunction?</u>

The court entered Ostrander's discharge in this case under § 727(a) on November 10, 2011, the case having been commenced on July 12, 2011.

##### 1. <u>Did Respondents Have Notice of Ostrander's Discharge?</u>

There is no dispute, and the court finds that Respondents Pigott and Pigott, Ltd. had notice of and were aware of Ostrander's discharge in this case at all relevant times.

##### 2. <u>Did Respondents Intend the Actions That Ostrander Alleges Violate Her Discharge?</u>

There is no dispute, and the court finds that Respondents intended to take all of the actions that Ostrander alleges violate her discharge. None of the filing of the proof of claim, the recording of the mortgages, the notices of the "scrivener's error" and the filing and re-filing of the state court lawsuit were accidental or inadvertent.

---

[7] Given the binding import of *Taggart*, the parties offered remarkably little guidance to the court about how they think it plays out based on the evidence. Initially, neither side cited it in their filings.

### 3.  Do Respondents' Actions Violate Ostrander's Discharge?

The actions of Respondent(s) that Ostrander contends violate her discharge fall into four general categories: filing a proof of claim in this case, recording the mortgages, giving notice of the "scrivener's error" and litigation in state court.

### a.  Filing a Proof of Claim

The first action Debtor lists in her prayer for relief as violating the discharge injunction is Piggott, Ltd.'s filing of a proof of claim in this case. The part that counsel apparently thinks is contemptuous is filing it as an unsecured claim when Pigott believed it to be secured by the 1120 S. Raab Road property.

Pigott, Ltd.'s act of filing a proof of claim in this case fails as a violation of the discharge injunction for two reasons.

First, the court's claims register in this case shows that Piggott filed the proof of claim on October 25, 2011, which was before the discharge was entered on November 10, 2011. In short, there was no discharge in effect at that time.

Second, the claim would not violate the discharge injunction in any event. Filing a proof of claim in a bankruptcy case can violate a discharge injunction in some situations. For example, if Pigott, Ltd. had filed an unsecured claim in one of Ostrander's two subsequent Chapter 13 cases, arguably it would violate the discharge injunction in this case. 11 U.S.C. § 101(5)(A) ("claim" means a "right to payment"). Pigott, Ltd. had no right to payment from Ostrander after her discharge. Filing the claim would have been an act to collect it from her personally. *But cf. In re Glance*, 487 F.3d 317, 321 (6th Cir. 2007). But the court does not understand how timely filing a proof of claim in this case would violate the discharge injunction. In filing a claim in a Chapter 7 case, a creditor is seeking payment from the bankruptcy estate, not from a debtor as her personal liability. Ultimately, this was a no asset case in which the Trustee made no distribution to any creditor.

Nor does the court understand why filing it as an unsecured claim, which it turned out to be, instead of as a secured claim, turns the act of doing so into a discharge violation. The claim was not secured by any property of Ostrander's bankruptcy estate because both the 1120 S. Raab Road property and the 9136 Angola Road property were titled to Stone Oak Investments, LLC and not to Ostrander. *See* 11 U.S.C. §§ 541(a) (definition of property of the estate); 506(a)(1) (determination of secured status). It was actually a general unsecured claim.  Had the 1120 S. Raab Road property been titled to Ostrander, the Trustee

13

would have had a claim for avoidance of the Pigott, Ltd. mortgage because it was not recorded when Ostrander commenced this case. *See* 11 U.S.C. §§ 544(a)(3), 551; *see In re Issacs*, 895 F.3d at 914.[8]

The court finds that Pigott, Ltd.'s pre-discharge filing of an unsecured claim in this case, which is the correct characterization of Piggott, Ltd.'s claim vis a vis Ostrander, did not violate her discharge. The court need not proceed with a *Taggart* analysis of contempt of court by Respondents for filing the proof of claim.

### b. Recording the Mortgages and Notices of Pigott's Scrivener's Error

The mortgages involve property located at 1120 S. Raab Road, Swanton, Ohio [Ex. C] and 9136 Angola Road, Holland, Ohio [Ex. D]. As noted, the 9136 Angola Road mortgage was signed by Debtor as "Managing and Sole Member" of Stone Oak Investments, LLC. The 1120 S. Raab mortgage was signed by Debtor as Mortgagor with no additional designations. Debtor now submits that Respondents violated her discharge by recording these mortgages on December 6, 2011. Diller made the same assertion in his letter to Piggott dated March 30, 2012. [Resp. Ex. D].

Pigott eventually realized that he identified the wrong Mortgagor on the 1120 S. Raab Road mortgage. At least twice, Piggott notified Ostrander's lawyers that the mortgage for the 1120 S. Raab Road property was wrong and demanded that she execute a corrected version. Debtor submits that these notices and demands violated the discharge injunction in this case.

For the following reasons, the court disagrees and finds that Respondents did not violate the discharge injunction by recording either mortgage or giving notice of the "scrivener's error" on the 1120 S. Raab Road mortgage. The court need not proceed with a *Taggart* analysis of contempt of court by Respondents for taking those actions.

### (1). The 9136 Angola Road Mortgage

Ostrander executed the 9136 Angola Road property mortgage on behalf of Stone Oak Investments, LLC, as Mortgagor, which was the owner of the real property. Under the pre-petition promissory note, Stone Oak Investments, LLC is also liable to Pigott, Ltd. for the debt for attorney's fees.

---

[8] Sometimes a secured creditor, such as for example a creditor with a lien on a car, files an unsecured claim in a Chapter 7 case. Absent circumstances such as a trustee liquidating collateral where there is perceived to be equity for distribution to unsecured creditors beyond the amount secured by a valid lien, Chapter 7 trustees only pay unsecured claims. Trustees generally object to claims filed as unsecured where it appears that there is collateral that has not been liquidated to determine an unsecured deficiency claim or a deficiency claim has not been estimated, 11 U.S.C. § 502(c). This is not one of those claims.

As already noted above, under § 524(e), and except for certain debts in community property states, "the discharge in no way affects the liability of any other entity, or the property of any other entity, for the discharged debts." 4 COLLIER ON BANKRUPTCY ¶ 524.05 (16th ed.). As Ostrander's Chapter 7 discharge does not prevent collection of the debts of Stone Oak Investments, LLC, Respondents' efforts to collect through the mortgage or otherwise, including by recording the mortgage post-petition, do not violate the discharge injunction in this case. Viewed in isolation, the fact of Ostrander's ownership of that entity does not turn Respondents' collection efforts against it into *in personam* collection of the discharged debt from her and asserts, in essence, reverse-piercing that does not work under Ohio law. *See Wick v. Ach*, 139 N.E.3d 480, 483 (Ohio App. 2019) (noting Ohio has not adopted the reverse-piercing doctrine).

### (2). <u>The 1120 S. Raab Road Mortgage</u>

Although the facts surrounding the 1120 S. Raab Road mortgage are different than the facts surrounding the 9136 Angola Road mortgage, the result of the discharge violation analysis is the same. Piggott's "scrivener's error" pertains to this property.

Pigott identified Ostrander as the Mortgagor of the 1120 S. Raab Road property in the mortgage. She signed it absent any designation that she was acting on behalf of an entity. Pigott testified that in drafting the mortgage for Ostrander to execute he made a "scrivener's error" because the 1120 S. Raab Road property mortgage should have identified Stone Oak Investments, LLC as Mortgagor.

When Respondents filed the 1120 S. Raab Road mortgage in the Lucas County Recorder's office post-discharge on December 6, 2011, the document thus mistakenly characterized Debtor as Mortgagor when, as a matter of public record, the owner of the property was Stone Oak Investments, LLC. Despite Pigott's subsequent demands that she do so, Ostrander as the principal of Stone Oak Investments, LLC, did not fix Piggott's mistake.

When Piggott recorded the mortgage, he apparently *thought* he was trying to collect a debt from property of the Debtor. As a matter of law, had Ostrander owned the 1120 S. Raab Road property and been the mortgagor, Pigott Ltd. eventually might have been able without violating the discharge injunction to take steps to collect the debt from the property itself, as an *in-rem* action against the real property and not an enjoined *in personam* action against Ostrander. Had Ostrander individually had an interest in the 1120 S. Raab Road property, at commencement of her Chapter 7 case it would have become property of the bankruptcy estate. 11 U.S.C. § 541(a)(1). It would have remained so on December 6, 2011, notwithstanding her discharge, compare 11 U.S.C. § 362(c)(1) and 11 U.S.C. § 362(c)(2), because it had not been abandoned by the Chapter 7 Trustee or otherwise by operation of law, *see* 11 U.S.C. § 554. On

15

December 6, 2011, Pigott then would have been engaged in an act to collect the Piggott, Ltd. debt from property that was still property of the bankruptcy estate and not at that time property of Ostrander's. Recording the mortgage against property of the estate would have violated the automatic stay, 11 U.S.C. § 362(a)(4) (the automatic stay applies to "any act to create, perfect, or enforce any lien against property of the estate."); § 362(c)(1). As such, it would have been treated as a voidable and likely void act if the Trustee sought to administer the property. *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 909 (6th Cir. 1993); *In Re Isaacs*, 895 F.3d at 909, 914. The act of recording the mortgage also would have been subject to avoidance as an unauthorized post-petition transfer. 11 U.S.C. § 549(a).

There were many potential problems with recording the erroneous and ineffective mortgage on the 1120 S. Raab Road property on December 6, 2011, and then making subsequent demands that Ostrander fix Pigott's mistake. But violation of the discharge injunction in this case is not one of them. The record does not show that Ostrander had any interest in the 1120 S. Raab Road property at commencement of her Chapter 7 case or otherwise.

### (3). Piggott's Notices of His Scrivener's Error

This is where Pigott's "scrivener's error" on the 1120 S. Raab Road mortgage enters the picture. Ostrander's motion for contempt alleges that Pigott's notices to Puligandla on December 6, 2011, and Diller on April 3, 2012, violated her discharge in this case. The court finds that they did not.

As Piggott says he eventually realized, he made a mistake by identifying Ostrander as Mortgagor instead of entity Stone Oak Investments, LLC, as shown on the Lucas County Auditor's card as the owner of the 1120 S. Raab Road property. Pigott's "scrivener's error" is a deep fake. As there is no evidence that Ostrander had any interest in the 1120 S. Raab Road property, the analysis whether notices of the mistake to Ostrander's lawyers and the accompanying demands that she fix it (which Pigott now wants the state court to do years later) is the same as analysis whether recording the faulty mortgage violated her discharge. And the court's conclusion is the same: Respondents did not violate the discharge injunction in taking these actions because they were an effort to collect the debt owed to Pigott, Ltd. from third party Stone Oak Investments, LLC, not Ostrander.

### c. The State Court Litigation

Respondent Piggott, Ltd. filed its first complaint in the Lucas County, Ohio Court of Common Pleas on June 11, 2018, and then voluntarily dismissed it, without prejudice to its refiling. [Doc. # 106, Ex. I]. Respondent Piggott, Ltd. electronically filed its second complaint in the Lucas County, Ohio Court of Common Pleas on November 13, 2019. The Case Number of the second complaint is G-4801-CI-

16

0201904445-000. [Dor Ex. 1]. It contains a jury demand. The Case Designation sheet appended to the second filing is stamped "REFILED COMPLAINT." [*See also* Dor Ex. 1, ¶ 1, p. 3/51]. Respondent Pigott is not a party plaintiff in either action but serves as counsel for Plaintiff Pigott, Ltd. in both actions.

The second complaint is nearly identical to the first but for adding one named defendant (Crissey Road Marketplace, LLC) and multiple John Doe defendants. Among the parties named as defendants in both complaints are Stone Oak Market, Inc., Stone Oak Marketplace, LLC, Stone Oak Investments, LLC, Debtor Bonnie Sue Ostrander, Hartsell and Farmer & Merchants Bank. As the complaints are the same in substance, the court will focus on the pending refiled complaint in deciding whether Respondents' actions in commencing and pursuing the state court litigation violate Ostrander's discharge. The second complaint remains stayed in the Lucas County Court of Common Pleas pending this proceeding.

The complaint alleges breach of contract, unjust enrichment, the right to an accounting, breach of good faith and fair dealing, and breach of fiduciary duty against the Stone Oak Investment and Stone Oak Market entities. [Ex. 1, ¶¶ 147-185]. As against all named defendants, including Debtor, the complaint alleges claims of fraud, fraudulent transfer, breach of constructive trust, and civil conspiracy. [*Id*., ¶¶ 186-229, 237-242]. A claim of piercing the corporate veil is alleged against the Stone Oak entities and Debtor. [*Id*., ¶¶ 230-236].

The court will analyze each claim to evaluate whether it constitutes an enjoined "commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such [discharged] debt as a personal liability of the debtor." 11 U.S.C. § 524(a)(2). Every claim of the complaint imports every paragraph of the complaint that goes before it, making it difficult for anybody to parse and analyze each claim.

After analyzing each claim separately, the court will analyze the complaint as a whole to determine whether its overall effect violates the discharge injunction as an effort to pressure and harass Ostrander into paying the discharged debt contrary to the broad purpose of the fresh start embodied in § 524(a). *In re Paglia*, 302 B.R. at 166; *In re Lett*, 2021 WL 4944094 at *8.[9]

---

[9] The refiled state court action is pending. Given that § 524(a)(2) broadly proscribes "the commencement or continuation of can action" or "an act" to collect a discharged debt as a personal liability of the debtor's, Ostrander's motion for contempt is ripe for determination with respect to the state court litigation as well as the completed actions about which she complains. The court need not wait for a judgment on the merits in the state court to decide the motion. The necessity of incurring substantial tangible and intangible defense costs and inherent litigation risk even on a lawsuit that fails on the merits is damage if that action involves defense of discharged debts. *In re Lumb*, 401 B.R. at 8-9. Pigott, Ltd.'s state court complaint(s) presents concrete questions about the scope of Ostrander's discharge.

### (1). <u>First Cause of Action</u>

Pigott, Ltd.'s First Cause of Action is captioned **<u>Breach of Contract as to Defendants Stone Oak</u>** **<u>Investments and Stone Oak Market</u>**. [Dor Ex. 1, ¶¶ 147-151]. It is based on the 2011 Promissory Note executed by those entities via Ostrander. While it unnecessarily includes Ostrander in its averments as a party both breaching the note and causing Pigott, Ltd. "damage," the first claim asks for money damages only from Stone Oak Investments and Stone Oak Marketplace, not from Ostrander.

On its face and in isolation, the First Cause of Action is thus not an act to collect, recover or offset any debt as a personal liability of Ostrander.

Nevertheless, pursuit of this claim against Stone Oak Investments, LLC is problematic and will be considered in evaluating the overall effect of the litigation.

With the consent judgment from the 9136 Angola Road tax foreclosure proceeding in state court, Pigott, Ltd. already has an uncollected money judgment for $48,218.77 against Stone Oak Investments, LLC, on a claim for breach of the 2011 Promissory Note. This time around Pigott, Ltd. demands $107,943.37.

Under the basic Ohio law doctrine of claim preclusion (or res judicata), a valid final judgment on the merits bars all subsequent actions based on any claim arising out of the transaction or occurrence that was the subject of the previous action. *Grava v. Parkman Twp.*, 73 Ohio St. 3d 379, 382 (1995) (syllabus). The promissory note is the basis for both Piggott, Ltd's cross--claim and consent judgment against Stone Oak Investments, LLC in the tax foreclosure action and its First Cause of Action for breach of contract in the pending state court complaint. All four of the elements of claim preclusion under Ohio law are present. *Id*. The consent judgment from the tax foreclosure action precludes Pigott, Ltd.'s ongoing efforts to obtain a second judgment against Stone Oak Investments, LLC on the same promissory note for more money. Re-litigation of this same claim as against Stone Oak Investments, LLC is barred by claim preclusion.

### (2). <u>Second Cause of Action</u>

Pigott, Ltd.'s Second Cause of Action is captioned **<u>Unjust Enrichment as to Defendants Stone</u>** **<u>Oak Investments and Stone Oak Market</u>**. [Dor Ex. 1, ¶¶ 152-157]. Notwithstanding the promissory note,[10] it alleges that Ostrander, Stone Oak Investments and Stone Oak Market received the benefit of

---

[10] While under Ohio law a party can plead in the alternative both a breach of contract and unjust enrichment, *Landes Capital Management, LLC v. HJT Holdings, LLC*, Case No. 1:19CV902, 2021 WL 3371095, *6 (N.D. Ohio August 3, 2021), the existence of a valid, enforceable contract covering the subject of a dispute generally precludes a claim for unjust enrichment and a party cannot recover on both theories, *MRI Software, L.L.C. v. West Oaks Mall FL, L.L.C.*, 116 N.E.3d 694, 702-03 (Ohio Ct. App. 2018) (unjust enrichment operates in the absence of a contract to prevent a party from retaining money or benefits that in justice and equity belong to another). At that, Ohio law requires a plaintiff to show "a superior equity so that it would be unconscionable for [the defendant] to retain the benefit." *Directory Servs. Group v. Staff Builders Int'l, Inc.*, No. 78611,

Pigott, Ltd's legal services without paying for them, that they were all "unjustly" enriched as a result and that Ostrander and the two entities caused "damage" to Pigott, Ltd. in excess of $25,000 in doing so. While the Second Cause of Action, like the First Cause of Action, unnecessarily includes Ostrander as a person enriched by Pigott Ltd's legal services and causing it damage, it asks for money damages for breach of the promissory note only from Stone Oak investments, LLC and Stone Oak Market, Inc.

On its face and in isolation, as with the First Cause of Action, the Second Cause of Action is not an act to collect, recover or offset any debt as a personal liability of Ostrander.

As with the First Cause of Action, however, the pursuit of this unjust enrichment claim as against Stone Oak Investments, LLC is problematic and will be considered by the court in evaluating the overall effect of the litigation.

Pigott, Ltd. included the same claim for unjust enrichment in its cross--claim against Stone Oak Investments, LLC in the state tax foreclosure action. Like the breach of contract claim, it merged into the consent judgment. Re-litigation of the same unjust enrichment claim against Stone Oak Investments, LLC is barred by claim preclusion.

### (3). <u>Third Cause of Action</u>

Pigott, Ltd.'s Third Cause of Action is captioned **<u>Account Stated as to Defendants Stone Oak Investments and Stone Oak Market</u>**. [Dor Ex. 1, ¶¶ 158-168]. It is unclear from this hearing, and there is conflicting evidence, as to who Pigott, Ltd.'s client(s) were. But the specific averments in this cause of action reiterate Pigott Ltd.'s provision of legal services to the specified defendants as well as to Ostrander, their receipt of invoices for same, the lack of objection to those invoices, Pigott, Ltd's demand for payment of the invoices and establishment of an uncontested, itemized account stated as a result. While the Third Cause of Action also unnecessarily includes Ostrander in its averments, it asks for the same money damages on the account, now up to $107,943.37, only from Stone Oak Investments, LLC and Stone Oak Market, Inc.

On its face and in isolation, the Third Cause of Action for an account stated is not an act to collect, recover or offset any debt as a personal liability of Ostrander.

---

2001 WL 792715, at *3(Ohio Ct. App. 2001) (citations omitted). None of the averments of the complaint show a superior equity in Pigott, Ltd. and unconscionability. They show a failure to pay a law firm's bill for legal services and the lawyer's efforts to firm up the ability to collect the debt from his client(s) as financial problems accelerated. While this claim fails the plausibility test of federal pleading articulated by the United States Supreme Court in the familiar cases *Twombley* and *Ipbal*, the Ohio Supreme Court has emphatically not adopted that standard. *Maternal Grandmother, Admr., v. Hamilton County Dep't of Job and Family Servs.*, --N.E.3d--, 2021 WL 5456421, 2021-Ohio-4096 (Ohio, November 23, 2021).

Nevertheless, for the same reasons as the First and Second Causes of Action, pursuit of this claim as against Stone Oak Investments, LLC is problematic and will be considered in evaluating the overall effect of the litigation.

The account stated claim against Stone Oak Investments, LLC is based on the same transaction—Pigott's Ltd.'s provision of legal services up to 2011—as the consent judgment in the tax foreclosure action. As with the breach of contract and unjust enrichment claims, Pigott, Ltd.'s effort to obtain a second judgment against Stone Oak Investments, LLC, this time for $107,943.37, is barred by claim preclusion.

### (4). <u>Fourth Cause of Action</u>

Pigott, Ltd.'s Fourth Cause of Action is captioned **<u>Breach of Good Faith and Fair Dealing as to Defendants Stone Oak Investments and Stone Oak Market</u>**. [Dor Ex. 1, ¶¶ 169-174]. This cause of action avers that Pigott, Ltd. provided legal services to Ostrander, Stone Oak Investments and Stone Oak Market pursuant to a written contract and that the contract includes an implied covenant of good faith and fair dealing. While it includes language asserting that Ostrander as well as the two entities breached the implied covenant and "injured" Pigott, Ltd. by failing to deliver a mortgage on the property at 1120 S. Raab Road, it asks for money damages only from Stone Oak Investments, LLC and Stone Oak Market, Inc.

On its face and in isolation, the Fourth Cause of Action for breach of an implied covenant of good faith and fair dealing in the promissory note is not an act to collect, recover or offset any debt as a personal liability of Ostrander. Pigott, Ltd. thereby concedes that any breach of such duty as to Ostrander occurred before the July 12, 2011, commencement of this case.

Nevertheless, for the same reasons as the First, Second and Third Causes of Action, pursuit of this claim as against Stone Oak Investments, LLC is problematic and will be considered in evaluating the overall effect of the litigation.

The contract to which this claim pertains is unclear. Pigott testified that he did not think there was a written fee agreement between his law firm and its client(s). The court infers that the Fourth Cause of Action pertains to the Promissory Note dated January 18, 2011. Paragraph 13 of the Promissory Note specifies that "Maker represents that they are contemporaneously with the execution of this Note providing Payee a mortgage lien" on the two properties. Pigott, Ltd. already took judgment against Stone Oak Investments, LLC on the note and the debt for legal services with the consent judgment in the tax foreclosure action. This claim is based on the same transactions—Pigott's Ltd.'s provision of legal services and breach of the Promissory Note—as the consent judgment in the tax foreclosure action. As with the breach of contract, unjust enrichment and account stated claims, Pigott, Ltd.'s effort to obtain a

20

second judgment against Stone Oak Investments, LLC, on the Fourth Cause of Action, this time for $107,943.37, is barred by claim preclusion.

### (5). <u>Fifth Cause of Action</u>

Pigott, Ltd.'s Fifth Cause of Action is captioned **<u>Breach of Fiduciary Duty as to Defendants</u> <u>Stone Oak Investments, Stone Oak Market and Stone Oak Marketplace</u>**. [Dor Ex. 1, ¶¶ 175- 185]. As do all claims in the complaint, the Fifth Cause of Action incorporates as if fully rewritten all prior allegations in the complaint. It seeks damages due to an alleged injury of an unspecified nature in excess of $25,000, that statement complying with a unique Ohio pleading convention. Ohio Civ. R. 8(A).

The bolded caption of the claim refers only to the three entity defendants. But the averments at paragraphs 176 through 185 accuse the entities' "respective owners, shareholders, members, managers, directors and/or officers" of breaching a duty "of care, loyalty, and good faith" owed to their former lawyer's law firm.[11] And that laundry list includes Ostrander, which Respondents know. Further, it claims a duty of the entities and their "respective owners, shareholders, members, managers, directors and/or officers" to protect the law firm as their creditor, which they allegedly breached. Unlike the first four causes of action, Pigott, Ltd. does not limit its demand for recovery to the entities, informing Ostrander of its intent to hold her personally liable for money damages.

Under Ohio law, "to succeed on a claim for breach of a fiduciary duty, a plaintiff must establish the existence of a fiduciary duty, a breach of that duty, and an injury proximately resulting therefrom." *Asia-Pacific Futures Research Symposium Planning Commt. v. Kent State Univ.*, 63 N.E.3d 780, 787 (Ohio Ct. App. 2016) (citation omitted). Further, a fiduciary relationship is one "'in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'" *Hope Academy Broadway Campus v. White Hat Mgmt., L.L.C.*, 145 Ohio St. 3d 29, 40 (Ohio 2015), citing *In re Termination of Emp. of Pratt,* 40 Ohio St.2d 107, 115 (Ohio 1974). A fiduciary relationship cannot be created unilaterally as both parties must understand that a special relationship of trust exists. *Nichols v. Chicago Title Ins. Co.*, 669 N.E.2d

---

[11] Directors, officers and managers of Ohio corporations and LLCs have a fiduciary relationship and position of trust as to the entity they serve, as now defined by statutes with respect to directors and managers and by common law with respect to officers. One such duty is not to waste entity assets. Breach of such duties support causes of action against officers, directors or managers that trustees and receivers assert. That fiduciary duty does not, however, extend to creditors. *Official Committee of Unsecured Creditors of PHD, Inc. v. Bank One, N.A.*, 2004 WL 3721325 (N.D. Ohio 2004) (corporations); *Custom Associates, L.P. v. VSM Logistics, LLC*, 154 N.E.2d 178, 182 (Ohio Ct. App. 2020) (LLCs). *Contra DeNune v. Consol. Capital of N. America, Inc.*, 288 F.Supp.2d 844, 859 (N.D. Ohio 2003) (corporation). Nor does a creditor have standing to assert causes of action belonging derivatively or otherwise to an entity or its owners directly against officers, directors and managers for breach of fiduciary duties they owe to said entity and its owners.

323 (Ohio Ct. App. 1995); *Shepard and Associates, Inc. v. Lokring Technology, LLC*, 2021 WL 1061893 *8 (N.D. Ohio, March 19, 2021).

Pigott, Ltd. does not aver even in conclusory fashion that it reposed any special confidence and trust in its former entity client(s), which would be an interesting twist on the lawyer-client relationship, let alone that the entities understood that it had done so. That leaves only its former client(s)' respective statuses as debtors to it based on the unpaid Promissory Note. Generally, however, and obviously so based on the standard for a fiduciary relationship, "a mere debtor-creditor relationship without more does not create a fiduciary relationship" under Ohio law. *See Groob v. KeyBank*, 108 Ohio St.3d 348 (Ohio 2006); *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98,101 (1988); *Umbaugh Pole Bldg. Co. v. Scott*, 58 Ohio St. 2d 282 (1979) (syllabus 1). Where the debtor is an entity, it follows there can be no basis for holding its officer, directors, or managers to a separate fiduciary duty to the entity's creditors. *Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust v. Baker (In re Amcast Indus. Corp.)*, 365 B.R. 91, 110 (Bankr. S.D. Ohio 2007)("[A] director has no distinct legal obligation directly to creditors, separate from the corporate entity as a whole, even when a corporation has reached the point of insolvency"). "The vast majority of business relationships …do not give rise to a fiduciary relationship." *Pasqualetti v. Kia Motors America, Inc.,* 663 F.Supp.2d 586, 598 (N.D. Ohio 2009), citing *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d at 10.

Perhaps understanding these basic principles of Ohio law, Pigott, Ltd. tries to find "something more" to create a fiduciary duty owing to it as a creditor of the entity Defendants, by not only the entity but by their directors, officers, members and shareholders as well. That "something more" is based on conclusory allegations made "upon information and belief" that the entities were on the verge of insolvency or insolvent. These assertions seem to raise a theory of liability colloquially known as "deepening insolvency." Paragraph 178 of the complaint explicitly uses language of deepening insolvency. [Dor Ex.1]. In broad brush, the theory of deepening insolvency posits that officers, directors and managers owe the entity they serve an independent fiduciary duty in circumstances of insolvency not to waste assets: "At its essence, the theory refers to the fraudulent prolongation of a corporation's life or expansion of its debt beyond insolvency in a manner resulting in a further dissipation of assets…" *Amcast*, 365 B.R at 115. For Pigott Ltd's purposes, that special duty extends directly to creditors of the entity.

The viability of this claim under Ohio law is shaky in the most charitable consideration of it. In this court's view, as explained below, there is no such separate cause of action under Ohio law in favor of either the entity and its owners or its creditors. But from the standpoint of the discharge injunction, the court finds it to be Respondents' purpose to throw it at the wall anyhow and force Ostrander to litigate it.

22

There is no controlling decision from the Ohio Supreme Court addressing this theory. In the absence of an Ohio Supreme Court precedent, there is conflicting case law from Ohio state and federal courts whether Ohio law recognizes any fiduciary duty owed directly to creditors in the so-called zone of insolvency. The better reasoned, more recent and most persuasive precedents, particularly in the context of the modern statutory structure of corporations and limited liability companies under Ohio law, find that there is no fiduciary duty to creditors in the zone of insolvency such that its breach supports a cause of action for damages.

The most prominent and influential precedent addressing deepening insolvency as a viable cause of action under Ohio law remains *Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust v. Baker (In re Amcast Indus. Corp.*), 365 B.R. 91 (Bankr. S.D. Ohio 2007). The plaintiff in *Amcast* was a liquidating trustee in a bankruptcy case, so he was asserting claims against debtor's officers and directors on behalf of both the debtor corporation and its creditors.

The court in *Amcast* thoughtfully and comprehensively analyzes Ohio statutes and the history of this theory, which it accurately describes as "an emerging and somewhat convoluted theory that 'has not been uniformly applied nor universally embraced.'" *Id.* at 115. (Citation omitted). After looking at the extant federal circuit courts of appeal cases that considered deepening insolvency, then predicting how Ohio courts would treat such a claim, the court concluded "at its best, the deepening insolvency theory is redundant of traditional causes of action recognized under Ohio law. At worst, the theory is inconsistent with principles of fiduciary responsibility and the business judgment rule codified in Ohio." *Id.* at 119.[12] It dismisses, for failure to state a claim, the plaintiff liquidating trustee's cause of action premised on deepening insolvency, holding that the fiduciary obligations of directors of an insolvent company operating outside formal pending insolvency proceedings remain under Ohio law to the corporation and its shareholders, and that the directors are under no obligation to treat corporate assets as a "trust" that must be liquidated on behalf of creditors. *Contra DeNune v. Consol. Capital of N. America, Inc.*, 288 F.Supp.2d at 859 (finding that a fiduciary duty is owed by officers of an insolvent corporation to the entities' creditors, relying on *Thomas v. Matthews*, 94 Ohio St. 32 (1916), with no discussion of Ohio statutes on corporations). *Accord Custom Associates, L.P. v. VSM Logistics, LLC*, 154 N.E.2d at 182 (rejects *DeNune,* agrees with *Amcast* and dismisses for failure to state a claim plaintiff creditor's cause of action against the officers of an insolvent debtor LLC based on the theory of deepening insolvency);

---

[12] One of those "traditional cause of action" is the law of fraudulent transfers, which is the basis for the Seventh Cause of Action in the complaint and will be discussed below.

23

*also see In re National Century Financial Enterprises, Inc.*, 846 F.Supp.2d 828, 894-95 (S.D. Ohio 2012) (concurring with analysis in *Amcast*); *Washington Penn Plastic Co., Inc. v. Creative Engineered Polymer Products, LLC*, 2007 WL 2509873 at *3 (N.D. Ohio 2007) (agrees with reasoning in *Amcast* in light of Ohio's statutory framework); *In re Hydrogen, L.L.C.*, 431 B.R. 337, 348 n.6 (Bankr. S.D.N.Y. 2010) (suggesting a split in Ohio caselaw on whether directors and officers of a corporation owe any fiduciary duty to creditors); *In re I.E. Liquidation, Inc.*, 2009 WL 2707223, *3 (Bankr. N.D. Ohio 2009) (finds *Amcast* persuasive because it analyzed statutes enacted after the *Matthews* case upon which *DeNune* relies).

Without calling it such, the most prominent example of a case embracing the fiduciary duty theory of deepening insolvency as viable in Ohio is *DeNune v. Consol. Capital of N. America, Inc*. from the federal Northern District of Ohio trial court in 2003. With a "see" cite to the *Thomas v. Matthews* case from the Ohio Supreme Court in 1916, and omitting analysis of Ohio corporate law statutes, *DeNune* has been criticized, distinguished and rejected, appropriately so in this court's view. In contrast to *Amcast*, there is no analysis supporting its refusal to dismiss a creditor's breach of fiduciary duty claim. Moreover, *DeNune* never references the basic Ohio principle, which was eminently clear at least with *Umbaugh* in 1979, that a debtor-creditor relationship does not create a fiduciary relationship and how insolvency is "something more" that should change that tenet.

The court infers from the hearing testimony and the documentary evidence that the bottom line with the Fifth Cause of Action and certain of the other claims in the complaint is the claimed damages are necessarily based upon the unpaid amounts due under the pre-petition Promissory Note executed by Ostrander and the entities and the consent judgment as to Stone Oak Investments, LLC. There is no other debt owed to Pigott Ltd. deserving it of claimed special protection because of the entities' insolvency. That the Defendant entities "were on the verge of insolvency and or were insolvent in August 2013 and continuing thereafter" does not transform Debtor's prepetition debt on the Promissory Note into a post-petition debt. Nor does trying to parse as separate and distinct Debtor's individual actions from her actions as an officer, director, manager, member or shareholder of the co-maker entities. *See In re Slater*, 573 B.R. 247, 255 (Bankr. D. Utah 2017) (where an unscheduled prepetition debt was discharged by operation of law, a post-petition state court default judgment on the debt based upon alter ego did not change this conclusion as it was related to the pre-petition debt). The same discharged debt remains at the core of this claim by Pigott, Ltd. notwithstanding its claimed efforts to collect it from her "only" as an officer, director, manager, shareholder, and member of the Defendant entities. She is the same individual regardless of what hat she is wearing, and it is the same discharged debt being collected. Permissible Ohio

conventions of pleading in the alternative aside, for purposes of the discharge injunction, the entities cannot be disregarded as wholly fictional while asserting with a wink that Debtor holds some separate overriding capacity as an officer, director, manager, member and shareholder that subjects her to different post-discharge third -party liability than her discharged debt for legal services and/or under the promissory note. This is not the realm of, for example, suits against government entities and government officials where that concept of separate capacity has critical factual and legal significance. It is more like Ostrander being made a guarantor of the entities' debts all over again. *See Amcast,* 365 B.R. at 119 ("adoption of such a cause of action would negate the [Ohio] business judgment rule and force directors of an insolvent corporation to be the personal guarantors of a business strategy's success"). Pigott, Ltd's Fifth Cause of Action is a subterfuge designed to squeeze Ostrander into paying the same discharged debt for legal fees or face the alternative of expending effort and resources to defend the same claim wrapped in the wolf's clothing of an untenable legal theory.

For the foregoing reasons, the court finds that the Fifth Cause of Action violates Ostrander's discharge in two independent ways. First, regardless of the confused legal window dressing, it remains an attempt to collect the discharged debt for legal fees from Ostrander personally. Second, the overall effect of this claim is to pressure and harass Pigott, Ltd's former client Ostrander into paying for its legal services or face extensive and expensive litigation over a dubious legal theory.

### (6). <u>Sixth Cause of Action and Eleventh Cause of Action</u>

Pigott, Ltd.'s Sixth Cause of action is captioned <u>**Fraud as to All Defendants.**</u> Pigott, Ltd.'s Eleventh Cause of Action is captioned <u>**Misrepresentation as to Defendants Stone Oak Investment and Stone Oak Market**</u>. Both causes of action sound in fraud.

### (i). <u>Sixth Cause of Action</u>

The Sixth Cause of Action is six conclusory paragraphs long. [Dor Ex. 1, ¶¶ 186-191]. As all of the causes of action do, the first paragraph adopts the kitchen sink approach of incorporating all prior averments of the Complaint. Paragraphs 187 through 191 are each one conclusory sentence long. Paragraph 187 says only that the Defendants defrauded Pigott, Ltd. "through the Scheme," which is described at ¶¶ 47-66 of the Refiled Complaint ("Refiled Complaint").

Paragraph 188 adds that the Scheme "and otherwise" amounted to a "malicious combination of the Defendants." "[O]therwise" is never particularized.

Paragraph 189 says that defendants "conspired" to fraudulently transfer the 1120 S. Raab Road property and the sale proceeds.

Paragraph 190 is a word salad that says bafflingly "independent of the conspiracy were the aforementioned acts committed by Defendants which were in and of themselves illegal acts."

Paragraph 191 concludes the Sixth Cause of Action stating that due to Defendants' fraud Pigott, Ltd. was damaged.

In turn the allegations of the "Scheme" underpinning the Sixth Cause of Action outline "a plan to assist Defendants Bonnie Ostrander, Stone Oak Market, Stone Oak Investments and Stone Oak Marketplace in securing a location and capital for a new convenience store in a location near 9211 Angola Road in an effort to hinder, delay, and defraud Pigott, Ltd. so that it would not collect upon its obligations and judgment (the "Plan of Defendants")." [Refiled Complaint at ¶ 55]. The Plan, otherwise bombastically called the Scheme, is alleged to include:

- Provision of a $36,000 loan from F&M Bank to Defendants Ostrander and Stone Oak Investments;
- Sale of 1120 S. Raab Road;
- Transfer of Sale Proceeds of 1120 S. Raab Board for the use in the businesses upon the Crissey Road Property;[13]
- Provision of loans to Defendant Hartsell to purchase the Crissey Road Property;
- Provision of encumbrances upon the assets of Defendants;
- Provision of assignments of lease and rents from Defendant Hartsell relative to Crissey Road Property;
- Provision of loans and leases from Defendant Hartsell with better than market terms to Defendants Ostrander and Stone Oak entities relative to businesses upon the Crissey Road Property;
- The organization of Defendant Crissey Road and to utilize it as a means of transferring, owning and hiding assets and transactions to defraud creditors of Ostrander and Stone Oak entities; and
- Use of transactions, transfers, purchases, sales, encumbrances and loans undertaken and completed to defraud creditors of Ostrander and Stone Oak Defendants.

[Refiled Complaint at ¶¶ 56-66].

Of these averments of actions taken (with the exception of the third bullet point), the first seven bullet points embrace the faulty premise of the Sixth Cause of Action that Ostrander cannot form a new entity, find new capital, set up a new business, enter new contracts and partnerships and run a new convenience store three years after the first business failed because Pigott, Ltd. did not get paid for its legal services. The inference is that unless Ostrander sets up her new convenience store business using the same entities that owe Pigott, Ltd. money, she is committing fraud. As to Ostrander, the Sixth Cause

---

[13] This act is the essence of and will be addressed by the court in connection with the Seventh Cause of Action pleading an alleged fraudulent transfer.

of Action violates the very purpose of her Chapter 7 discharge, which is to afford a fresh start free from old liabilities to enable a debtor to pursue new business and job opportunities.

Moreover, even under Ohio's less demanding pleading standards, the Sixth Cause of Action fails to state a cause of action for fraud. The following six elements comprise a claim for fraud under Ohio law:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*State ex rel. Selbert v. Richard Cyr, Inc.*, 157 Ohio St.3d 266, 274-75 (2019). Under Rule 9(b) of the Ohio Civil Rules, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *See* Ohio Civ. R. 9(B). To satisfy this requirement, "'a plaintiff should plead the time, place, and content of the false representation, the fact misrepresented, and the nature of what was obtained or given as a consequence of the fraud,' along with the identity of the alleged fraudster." *White v. Pitman*, 156 N.E.3d 1026, 1033 (Ohio App. 2020) citing *Meehan v. Mardis*, 146 N.E.3d 1266, 1273 (Ohio App. 2019); *Ross v. PennyMac Loan Services LLC*, 761 Fed. Appx. 491, 493-94 (6th Cir. 2019) (citations omitted). The purpose of these requirements ensures "a defendant is provided with at least the minimum degree of detail necessary to begin a competent defense." *In re Goss*, 605 B.R. 189, 198 (Bankr. S.D. Ohio 2019) citing *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503 (6th Cir. 2008).

Applying these requirements to Pigott, Ltd.'s fraud claim, the Sixth Cause of Action does not tell each Defendant, specifically including Ostrander, what misrepresentation(s) was allegedly made to Pigott, Ltd. or what fact(s) were allegedly concealed from Pigott, Ltd. under a duty to communicate to him as the essence of the fraud under Ohio Rule 9(b). *See In re Goss*, 605 B.R. at 199 (failure of the amended complaint to state where the representations were made and whether they were written, verbal, express or implied failed to comply with Rule 9(b)); *Wick v. Ach*, 139 N.E.3d at 485 (alleged representations made by an unnamed agent of the company was insufficient to meet the particularity requirement for fraud). Averments stating the time, place and content of any false representations or omissions are absent, as is any description of the nature of what was obtained or given as part of the resulting damages. The complaint also fails to address how Pigott, Ltd. justifiably relied on the (missing) representation(s) or concealed fact(s). *See Armatas v. Aultman Health Foundation*, Case No. 5:19-cv-00349, 2019 WL 8755139 *10

27

(N.D. Ohio 2019) (a formulaic recitation of the justifiable reliance and resulting injury elements were insufficient to state a claim for fraud).

Most revealing is paragraph 66 of the refiled complaint, addressing the Scheme which states:

> Upon information and belief, the Plan of the Defendants includes transactions, transfers, purchases, sales, encumbrances and loans which were undertaken and completed in an attempt to hinder, delay and defraud creditors of Defendants Bonnie Ostrander, Stone Oak Investments, Stone Oak Market, Stone Oak Marketplace and/or Crissey Rd, including Plaintiff Pigott, Ltd. and which *are currently unknown to Pigott, Ltd. but will be uncovered during the discovery process*.

(Refiled Complaint at ¶ 66. Emphasis added).  At best, the allegations taken as a whole consist of a series of events with no particularity, set forth with conclusory statements and a promise of what discovery may disclose.  The allegations of fraud fail to meet the particularity requirement demanded by Ohio Rule 9(b) and fail to state a claim of fraud.

The allegations of the Sixth Cause of Action unnecessarily duplicate those of the Seventh Cause of Action of fraudulent transfer and, virtually word for word, the Tenth Cause of Action for civil conspiracy, both of which are separately addressed below.

The court finds that the Sixth Cause of Action as pled violates Ostrander's discharge because it is unnecessarily duplicative, exaggerated, and so vague and insufficiently pled that (1) discharged pre-petition actions can be brought within it and (2) it amounts to an effort to force Ostrander to face unnecessary and expensive discovery and defense costs at the risk of an improper default judgment.

### (ii).  Eleventh Cause of Action

On its face the Eleventh Cause of Action is captioned **Misrepresentations as to Defendant Stone Oak Investments and Stone Oak Market**. It too is six one-sentence paragraphs long, with the first paragraph incorporating every prior averment of the complaint.  [Dor Ex. 1, ¶ 243].

Paragraph 244 states that Ostrander, Stone Oak Investments, LLC, Stone Oak Market, Inc. made unspecified representations to have Plaintiff enter into the Promissory Note, which contradicts Ostrander's credible hearing testimony; she said she signed it because Pigott asked her to sign it.

Paragraph 245 states that Ostrander and the entities misrepresented unidentified facts and made unidentified false representation to "deceive or mislead" Pigott, Ltd.

Paragraph 246 states that Pigott, Ltd. "justifiably relied" on those misrepresentations without saying how.

Paragraph 247 says that Ostrander's, Stone Oak Investments, Inc.'s and Stone Oak Market, Inc's unidentified misrepresentations damaged Pigott, Ltd. in some unspecified way.

While the averments of the Eleventh Cause of Action refer to some of the elements of a fraud claim under Ohio law, such as justifiable reliance, it nevertheless suffers the same pleading deficiencies as the Sixth Cause of Action in failing to plead with particularly the who, the time, the place and the content of any alleged misrepresentation by any of Ostrander, Stone Oak Investments, LLC and Stone Oak Market. But paragraph 248 demands damages only from the two entities. As with other of the First through Fourth Causes of Action, while the Eleventh Cause of Action includes Ostrander in its averments of deceiving the law firm and causing Piggott, Ltd. damage, it only seeks a money judgment against Stone Oak Investments, LLC and Stone Oak Market, Inc. In so doing, Piggott, Ltd. inherently admits that the conduct occurred before Ostrander commenced this case on July 12, 2011. The only misrepresentation identified as such elsewhere in the complaint appears at paragraphs 33 through 36, where Pigott, Ltd. alleges that Ostrander and the entities knew that title to the 1120 S. Raab Road property, a matter of public record, was in Stone Oak Investments, LLC's name, and that they concealed it from him to deceive Pigott, Ltd. To except it from Ostrander's discharge, Piggott, Ltd. would have had to bring a nondischargeability action against her in this court under § 523(a)(2), (4) or (6). S*ee, e.g., Jennings v. Bodrick (In re Bodrick)*, 509 B.R. 843, 854-55 (Bankr. S.D. Ohio 2014). It did not. Which perhaps explains why Ostrander is omitted from the demand for relief in Count Eleven of the complaint.

On its face and in isolation, notwithstanding its obvious deficiencies Pigott, Ltd.'s Eleventh Cause of Action is not an act to collect, recover or offset any debt as a personal liability of Ostrander.

### (7). <u>Seventh Cause of Action</u>

Pigott, Ltd.'s Seventh Cause of Action is captioned **<u>Fraudulent Transfer as to All Defendants</u>**. This cause of action alleges that the transfer of the 1120 S. Raab Road property and sale proceeds "constitute a fraudulent conveyance, of the property known as 1120 S. Raab and the Sale Proceeds, as set forth within R.C. 1336.01, et al." [Dor Ex. 1, ¶ 193]. Pigott, Ltd. seeks money damages against all defendants in excess of $25,000.00 and seeks to avoid any transfers. [*Id*. at ¶¶ 216-17].

The Ohio Uniform Fraudulent Transfer Act is Chapter 1336 of the Ohio Revised Code. It creates a right of action for a creditor to set aside an allegedly fraudulent transfer of assets to the extent necessary to satisfy the creditor's claims. *Vancrest Management Corp. v. Mullenhour*, 140 N.E.3d 1051, 1064 (Ohio App. 2019) (citations omitted). The concept of fraudulent transfers, now codified, is an ancient part of a creditor's collection arsenal. As Pigott, Ltd.'s assertion of the claim demonstrates, it is precisely one of

29

the redundant "traditional causes of action" referred to by the court in *In re Amcast* that obviates the need to conjure up a cause of action under Ohio law such as deepening insolvency. *In re Amcast*, 365 B.R. at 119. The law of fraudulent transfers sets boundaries of acceptable debtor conduct as to creditors in conveying assets and incurring obligations.

As explained by the court in *Vancrest*:

> The Ohio UFTA's "key operative provisions are R.C. 1336.04 and R.C. 1336.05." *Id.* "[I]rrespective of when the debt arose, a creditor may prove that the contested asset transfer met the R.C. 1336.04 elements, and thus, was a fraudulent transfer as defined by this provision." *Id.* citing *E. Savs. Bank & Bucci*, 7th Dist. Mahoning No. 08 MA 28, 2008-Ohio-6363, 2008 WL 5124559, ¶ 93 and *In re Youngstown Osteopathic Hosp. Assn.* at 408-409. "As to a debt that existed when the debtor made the contested asset transfer, a creditor may prove that the transfer met the R.C. 1336.05(A) elements, and thus was a fraudulent transfer as statutorily defined." *Id.* citing *Bucci* at ¶ 93.

140 N.E.2d at 1064. Under these provisions, "fraud is imputed to the debtor when the statutory elements have been met." *Id.* (quoting *In re Youngstown Osteopathic Hosp. Assn.*, 280 B.R. 400, 408 (Bankr. N.D. Ohio 2002)).

Two types of transfers (or incurrence of obligations) are addressed in Ohio Revised Code Chapter 1336: "actually fraudulent transfers" and "constructively fraudulent transfers." Not all creditors have standing under the statute to challenge both types of transfers.

An "actually fraudulent transfer" is one made with "actual intent to hinder, delay or defraud any creditor of the debtor."[14] R.C. 1336.04(A)(1). Under Ohio law, a transfer may be avoided as actually

---

[14] The elements of a fraudulent transfer claim under R.C. 1336.04(A)(1) include "(1) a conveyance or incurring of a debt; (2) made with actual intent to defraud, hinder, or delay; (3) present or future creditors." *Brown Bark II, L.P. v. Coakley*, 188 Ohio App.3d 179, 183 (Ohio App. 2010) (citations omitted). Because this cause of action requires actual intent, the particularity requirements of Rule 9(b) have been held to apply to a claim under R.C. 1336.04(A)(1). *See Van-American Ins. Co. v. Schiappa*, 191 F.R.D. 537, 543 (S.D. Ohio 2000). While direct evidence of fraudulent intent is difficult to attain, a creditor may establish fraudulent intent where the circumstances establish "badges of fraud." *Vancrest* at 1064, citing *Blood v. Nofzinger*, 162 Ohio App.3d 545, ¶ 36. Those badges of fraud include but are not limited to:

> (1) Whether the transfer or obligation was to an insider;
> (2) Whether the debtor retained possession or control of the property transferred after the transfer;
> (3) Whether the transfer or obligation was disclosed or concealed;
> (4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threated with suit;
> (5) Whether the transfer was of substantially all of the assets of the debtor;
> (6) Whether the debtor absconded;
> (7) Whether the debtor removed or concealed assets;

fraudulent if it was motivated entirely or merely in part by a desire to hinder, delay or defraud creditors. *In re Stanley*, 384 B.R. 788, 799 (Bankr. S.D. Ohio 2008). A creditor whose claim arose before the transfer was made or within a reasonable time not to exceed four years after the transfer was made has statutory standing to challenge a transfer as actually fraudulent. R.C. 1336.04(A).

The elements of a "constructively fraudulent transfer" are set forth in both R.C. 1336.04(A)(2)[15] and 1336.05.[16] A "constructively fraudulent transfer" does not depend on the intent with which the transfer was made. *In re Crescent Communities, Inc.*, 298 B.R. 143, 149 (Bankr. S.D. Ohio 2003). A constructively fraudulent transfer may exist without any intent on the part of the debtor to hinder, delay or defraud creditors. No actual fraud needs to be shown. *In re Citi-Toledo Partners II*, 254 B.R. 155, 161 (Bankr. N.D. Ohio 2000). Instead, the focus is on the effect of the transaction on the debtor's finances.

A creditor whose claim arose before the challenged transfer was made has broader options to challenge it under the statute, as it may proceed under any of R.C.§§ 1336.04(A)(1), 1336.04(A)(2) and 1336.05. A creditor whose claim arose within a reasonable time not to exceed four years after the transfer occurred may challenge it either as actually fraudulent under R.C. § 1336.04(A)(1) or as constructively fraudulent, but only under R.C. § 1336.04(A)(2). A creditor whose claim arose after the challenged

---

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

R.C 1336.04(B)(1-11).

[15] A claim for a constructively fraudulent transfer under R.C. 1336.04(A)(2) requires proof that the transfer was made without receipt of reasonably equivalent value and either one of two additional circumstances: (1) that the "debtor was engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or (2) that "the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." R.C. 1336.04(A)(2). "Because Section 1336.04(A)(2) does not require proof of actual fraud, the heighted Rule 9(b) pleading requirements do not apply." *E. Hanlin Bavely, Trustee v. Croucher (In re Chambers)*, Case No. 19-10309, AP 20-1009, 2020 WL 8184302 *7 (Bankr. S.D. Ohio 2020) citing *Schiappa*, 191 F.R.D. at 542-43.

[16] A claim for a constructively fraudulent transfer under R.C. 1336.05 requires proof of the following elements:

First, a transfer made by a debtor is fraudulent if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer. R.C. 1336.05(A). Second, a transfer made by a debtor is fraudulent if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent. R.C. 1336.05(B).

*E. Sav. Bank v. Bucci*, Case No. 08 MA 28, 2008 WL 5124559 *15 (Ohio App. 2008). And like a claim under R.C. 1336.04(A)(2), a claim under R.C. 1336.05 is not subject to the heightened pleading demands of Rule 9(b). *Van-American Insurance*, 191 F.R.D. at 543.

transfer lacks statutory standing to challenge it as constructively fraudulent under R.C. § 1336.05. The logic of these statutory standing distinctions is readily apparent. The additional circumstances of a constructively fraudulent transfer under R.C. § 1336.04(A)(2) involving property depletion and debts incurred beyond the debtor's ability to pay them are forward looking and could impact a debtor's ability to repay creditors who come later. The additional circumstance of a constructively fraudulent transfer under R.C.§ 1336.05 is insolvency, which is defined by the statute at R.C.§ 1336.02. As defined, insolvency occurs at a point in time.

In Pigott, Ltd.'s complaint, the Seventh Cause of Action is brought against all Defendants, as with other of its causes of action not always pleading who is alleged to have done or received what, where and when. It invokes statutory definitions under R.C. 1336.01, but never identifies by number which provisions of Chapter 1336 it is asserting. Nevertheless, the function of a complaint being to plead facts giving appropriate notice of what Defendant(s) are alleged to have done or not done, it does not have to plead the law.

For the purpose of evaluating whether Pigott, Ltd.'s Seventh Cause of Action violates Ostrander's discharge, there are two material and undisputed facts. First, Stone Oak Investments, LLC's debt to Pigott, Ltd. arose before the alleged transfer(s) at issue occurred. Second, the transfer(s) at issue occurred after the commencement of this bankruptcy case on July 12, 2011. The transfer of the 1120 South Raab Road property occurred on June 12, 2014. [Refiled,Complaint, ¶¶ 86 and 88]. Post-petition conduct, such as unambiguously alleged by Pigott, Ltd. in this Seventh Cause of Action, is not discharged. *See In re Gray*, 586 B.R. 347, 352 (Bankr. D. Kan. 2018) (liabilities for post-petition conduct are not discharged).

While there may be problems with the Seventh Cause of Action, such as pleading insufficiencies, the validity of any claimed lien in transferred assets, and statute of limitation and other affirmative defenses, Pigott, Ltd. is unconstrained by Ostrander's discharge from asserting and litigating the Seventh Cause of Action against all the Defendants, including Ostrander. Armed with her fresh start, Ostrander is free to set up a new business with a new entity and find new capital and incur new debt. But she would not be free to do so utilizing the assets of another entity acquired for no or inadequate consideration if Pigott, Ltd. can prove that she was a transferee of a transfer fraudulent as to it. Respondents may proceed with this claim(s) against Debtor under Chapter 1336 of the Ohio Revised Code because, win or lose, its very pursuit is outside of the protection of the discharge injunction in this case.

Pigott, Ltd.'s Eighth Cause of Action is styled as **Breach of Constructive Trust as to All Defendants**. Pigott, Ltd. contends that as of the date of the loan from Farmers & Merchants Bank to Defendants Ostrander and Stone Oak Investments, LLC in April 2014 and as of the date of transfer of the 1120 S. Raab Road property in June 2014: (1) Defendants were aware of Pigott, Ltd.'s status as a creditor; (2) defendants were under an equitable duty to convey the sale proceeds to Pigott Ltd. to prevent unjust enrichment and/or fraud; (3) by failing to provide payment of the sale proceeds to Pigott, Ltd, defendants breached and violated a constructive trust; and (4) the defendants' actions require imposition upon the long ago Sale Proceeds of a constructive trust. [Dor Ex. 1, ¶¶ 219-229].

The problem with this "cause of action" is that it is not a cause of action under Ohio law so much as it is an equitable remedy. As noted by the Ohio Supreme Court in *Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 281 (2006):

> A constructive trust is a "'trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice.'" (Footnotes omitted.) *Ferguson v. Owens* (1984), 9 Ohio St.3d 223, 225, 9 OBR 565, 459 N.E.2d 1293, quoting 76 American Jurisprudence 2d (1975) 446, Trusts, Section 221. A constructive trust is considered a trust because " '[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.' " *Id.* at 225, 9 OBR 565, 459 N.E.2d 1293, quoting *Beatty v. Guggenheim Exploration Co.* (1919), 225 N.Y. 380, 386, 389, 122 N.E. 378.
>
> A constructive trust is an *equitable remedy* that protects against unjust enrichment and is usually invoked when property has been obtained by fraud. *Ferguson*, 9 Ohio St.3d at 226, 9 OBR 565, 459 N.E.2d 1293; *Aetna Life Ins. Co. v. Hussey* (1992), 63 Ohio St.3d 640, 642, 590 N.E.2d 724.

(Emphasis added.) Chapter 1336 of the Ohio Revised Code preserves as a form of relief to remedy a fraudulent transfer, subject to principles of equity, "[a]ny other relief that the circumstances may require. R.C. 1336.07(A)((3)(c). "Any other relief" includes imposition of a constructive trust. *In re Bushey*, 210 B.R. 95, 105 (B.A.P. 6th Cir. 1997).

Pigott, Ltd.'s Eighth Cause of Action is a mish-mash of allegations that reflects some misunderstanding of Ohio constructive trust law. It both asserts that there is a constructive trust that has been breached, which misapprehends the concept, and asks that one be imposed, which comports with the

Ohio Supreme Court's analysis. The request for imposition of a constructive trust over the Sale Proceeds assumes both that Pigott, Ltd. somehow had an interest in the 1120 S. Raab Road property and the Sale Proceeds, as opposed to it simply being owed a debt by Stone Oak Investments, LLC, and that it can trace those proceeds by clear and convincing evidence into….something. Nevertheless, while there appear to be problems with the Eighth Cause of Action for the state court to work through, it is not so baseless that it amounts to harassment of Ostrander to coerce her into paying her discharged debt.

Moreover, as pled, the Eighth Cause of Action appears limited to post-petition transactions around disposition of the 1120 S. Raab Road Property and the Sale Proceeds. As a result, and to the extent Respondents pursue it as such, the court finds that the Eighth Cause of Action does not violate the discharge injunction.

### (9). <u>Ninth Cause of Action</u>

Pigott, Ltd.'s Ninth Cause of Action is styled **Piercing of the Corporate Veil as to Defendants Bonnie Ostrander, Stone Oak Investments, Stone Oak Market and Stone Oak Marketplace**. The allegations contend in pertinent part that "Bonnie Ostrander's control over Defendants Stone Oak Investments, Stone Oak Market and Stone Oak Marketplace is so complete that each respective entity does not have a separate mind, will or existence of their own" and that these entities "are the alter ego of Defendant Bonnie Ostrander." [Dor Ex. 1 at ¶¶ 232-33]. The cause of action further contends:

> Defendant Bonnie Ostrander's control of Defendants Stone Oak Investments, Stone Oak Market and Stone Oak Marketplace was utilized to commit the fraud(s), illegal act(s) and/or similarly unlawful act(s) as set for the above.
>
> Due to Defendants' acts and frauds as set forth herein, Plaintiff has been damaged in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00).
>
> Plaintiff requests an order from this court disregarding the corporate and limited liability company forms of Defendants Stone Oak Investments, Stone Oak Market and Stone Oak Marketplace holding their respective owners, shareholders, members, managers, directors and/or officers personally liable for the entities acts and omissions allowing Plaintiff to reach their separate assets as it would be unjust to allow them to hide behind the fiction of the corporate and limited liability form.

[*Id*. at ¶¶ 234-36].

As with imposition of a constructive trust, piercing the corporate veil or alter ego liability is not an independent cause of action so much as a remedy for a claim. *RCO Intern'l Corp. v. Clevenger*, 180 Ohio App. 3d 211, 214 (Ohio App. 2008). It is a rare exception that should only be applied in the case of

fraud or other exceptional circumstances. *Meinert Plumbing v. Warner Industries, Inc.*, 90 N.E.3d 966, 975 (Ohio App. 2017) citing *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, ¶ 17.

Pigott, Ltd.'s Ninth Cause of Action is vague as to what acts and actions justify piercing the corporate veil and as to which entity to get to Ostrander. It carries a substantial risk in its pursuit of being a subterfuge for making her pay the very debt that has been discharged. To the extent that Pigott, Ltd. is pursuing alter ego liability against Stone Oak Investments, LLC and Stone Oak Market, Inc. on the same claims as those against Ostrander that are discharged, the court finds that the Ninth Cause of Action violates the discharge injunction. Its purposeful vagueness in conjunction with kitchen sink pleading incorporation of every averment that came before raises a violation of the discharge injunction in pursuit of alter ego liability on those claims, much like the Fifth Cause of Action.

This case is remarkably similar to *In re Torres,* 594 B.R. 890, 896-97 (Bankr. C.D. Cal. 2018). In *Torres*, the creditor insisted, like Respondents, that it was really not pursuing discharged claims against the debtor. But where the creditor retained the debtor as a defendant in a state court action in continued pursuit of alter ego claims against entities on the same debts discharged as to debtor, the bankruptcy court found a violation of the discharge injunction.

To the extent Pigott, Ltd.'s pleading and actual pursuit of its Ninth Cause of Action on the merits is limited as a remedy for actions of Ostrander or another entity Defendant in connection with the post-petition transfer of the 1120 S. Raab Road property and the Sale Proceeds, the court finds that it does not violate the discharge injunction.  As presently plead, however, it is not so limited. Respondents conspicuously avoid articulating dates and the alter ego cause of action presents as vague, speculative and undeveloped. While it may meet Ohio pleading standards, the court finds that the room within it to pursue discharged claims violates the discharge injunction.

### (10).  Tenth Cause of Action

Pigott, Ltd.'s Tenth Cause of Action alleges **Civil Conspiracy as to All Defendants,** which includes Ostrander. [Dor Ex. 1, ¶¶ 237-242].

Under Ohio law, a civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damage." *Williams v. Aetna Fin. Co*., 83 Ohio St. 3d 464, 475 (1998), *cert. denied*, 526 U.S. 1051 (1999). The elements of a civil conspiracy claim are "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach,*

35

*Inc. v. New York City Transit Auth., Inc.*, 90 Ohio App. 3d 284, 292 (Ohio Ct. App. 1993). In turn, the malicious combination of an Ohio civil conspiracy claim requires proof of two or more entities "act[ing] in concert …to conjure up a scheme to purposefully and intentionally cause injury to…[the plaintiff.]." *Fifth Third Mortg. Co. v. Perry*, Case No. 12CA13, 213 WL 3946087, at *10 (Ohio Ct. App. 2013). The requisite state of mind to amount to the malice part of a "malicious combination" involves a state of mind under which a person commits a wrongful act on purpose, without reasonable or lawful excuse. *Id.* at *9. A claim of civil conspiracy cannot succeed unless there is an underlying unlawful act, which is broadly construed by Ohio courts. *Williams,* 83 Ohio St. 3d at 475; *Premier Therapy, LLC v. Childs,* 75 N.E.3d 692, 729-30 (Ohio Ct. App. 2016). If proven, a fraudulent transfer can also constitute an "unlawful act" for purposes of an Ohio civil conspiracy claim. *E.g., Kent State University v. Bradley University*, 136 N.E.3d 774, 792 (Ohio Ct. App. 2019).

Pigott, Ltd. broadly alleges that "Defendants conspired to hinder, delay and defraud Pigott, Ltd, through the Scheme of Defendants, the fraudulent transfer of 1120 S. Raab and the fraudulent transfer of the Sale Proceeds." [Dor Ex. 1 at ¶ 239]. The conspirators are never specifically identified; while pleading in the alternative is permissible, ultimately Ostrander cannot both be one and the same as some or all of the entity Defendants and conspire with them. The overall vagueness of the claim, including a reference to the "Scheme of Defendants *and otherwise*" and unspecified "aforementioned acts" leaves open Respondents' pursuit of discharged claims. An example of a civil conspiracy claim that could be shoehorned into Pigott, Ltd's Tenth Cause of Action as pled includes tricking Pigott on behalf of Piggott, Ltd. into disregarding public records and drafting the Pigott mortgage incorrectly identifying Ostrander as mortgagor of the 1120 S. Raab Road property. As to Ostrander, any such claim is discharged.

To the extent that Respondents limit pursuit of the Tenth Cause of Action to the post-petition actions around disposition of 1120 S. Raab Road and the Sale Proceeds, they are not violating Ostrander's discharge. As pled, the pursuit is not so limited and constitutes a violation of the discharge injunction.

### (11). <u>Twelfth Cause of Action</u>

Pigott, Ltd.'s Twelfth Cause of Action is styled as **Respondeat Superior as to Defendant F&M Bank**. [Dor Ex. 1, ¶¶ 249-252]. As this claim does not name Ostrander either directly or indirectly or seek any relief from her, its assertion and pursuit do not violate the discharge injunction.

### (12). <u>Thirteenth Cause of Action</u>

Pigott, Ltd's Thirteenth (and final) Cause of Action in the state court complaint is captioned **Declaratory Judgment**. Specifically, Pigott, Ltd. "claims a mortgage and/or interest upon the real

36

property commonly known as 1120 S. Raab Road and as legally described in the Pigott Mortgage" and "requests declaratory judgment as to the parties' right and duties thereunder." [Dor Ex. 1 at ¶¶ 254-55]. First, it does not seek monetary relief from or against Ostrander personally. Second, it relates to the interests and property of Stone Oak Investments, LLC and the post-petition fraudulent transfer claim set forth in the Seventh Cause of Action. Therefore, the Thirteenth Cause of Action seeking a declaratory judgment does not violate the discharge injunction.

(13). <u>State Court Action as a Whole</u>

To summarize, in examining the individual claims in isolation the court finds that Ostrander has not shown by clear and convincing evidence that the First, Second, Third, Fourth, Seventh, Eighth, Eleventh, Twelfth and Thirteenth Causes of Action violate Ostrander's discharge. The court finds that Ostrander has shown by clear and convincing evidence that the Fifth, Sixth, Ninth, and Tenth Causes of Action violate Ostrander's discharge.

The court cannot ignore the content and effect of the state court complaint(s) as a whole.

As an initial matter, the state court complaint(s) contain language acknowledging Ostrander's discharge in this case and disclaiming any intent or effort to collect discharged debts. Further, the reader is advised that nothing in the complaint can be construed as doing so. Pigott, Ltd. is trying to use that language to insulate it from liability for violations of Ostrander's discharge. It does not. The willfulness of a creditor's actions is not a consideration in determining whether a creditor's act has violated the discharge injunction. *Taggart*, 139 S.Ct. at 1802 (citation omitted). Saying it does not mean to do so is an ineffective dodge of the objective reality of the complaint(s) as described above and in this part of the opinion. *See In re Sharak*, 571 B.R. 13, 22-23 (Bankr. N.D.N.Y. 2017) (mortgage statements with collection disclaimer ineffective to shield creditor from discharge violation where overall circumstances indicated otherwise).

Fundamentally, as discerned from the hearing testimony and otherwise from the record, Pigott, Ltd.'s client(s) did not pay it what they owed, an unfortunate but not uncommon situation, with its ability to collect then hampered by its and their lawyer's own mistake. There are claims that can be teased from the state court complaint, the pursuit of which do not violate Ostrander's discharge as falling outside the statutory limits of its scope. The post-petition fraudulent transfer claim and related remedies and claims to obtain a money judgment against Stone Oak Investments, LLC and Stone Oak Market, Inc. *per se* are not discharged.

37

But the permissible claims are exceedingly hard to discern. And that is a problem from the objective perspective of whether the complaint and any claim alleged amount to an act to collect or recover discharged debts as Ostrander's personal liability by harassing and coercing her into paying up. *See Renfrow v. Grogan (In re Renfrow)*, 2019 WL 1782625 at *21 n. 149 (Bankr. N.D. Okla. 2019) ("Imprecise pleading that leaves a discharged debtor guessing whether the creditor seeks to collect discharged debt is sufficient to warrant sanctions for contempt."), supplemented by *In re Renfrow*, 629 B.R. 83 (Bankr. N.D. Okla 2021) (on remand to apply *Taggart* standard for fining of contempt), citing *Hambrick v. Perceptual Development Corp.(In re Hambrick)*, 481 B.R. 105, 115 (Bankr. E.D. Okla. 2012), overruled by *Taggart* by implication only as to contempt standard applied (here state court complaint could have been drafted to make it absolutely clear damages limited to debtor's post-petition actions, but "appears to have been drafted to allow Defendants as much flexibility as possible with which to structure any type of damage claim and remedy for any time period they wish to pursue") and *Desert Pine Villas Homeowners Association v. Kabiling (In re Kabiling)*, 551 B.R. 440, 448 (B.A.P. 9th Cir. 2016), overruled by *Taggart* by implication only as to contempt standard applied (while state court complaint could have been drafted so as not to violate the discharge injunction, it was not). Here, the following problems with the state court complaint as a whole lead the court to the conclude that it violates the discharge injunction as an effort to harass and coerce Ostrander to pay up personally on discharged claims.

First, the state court complaint is a mess. It has complicated this court's job, will complicate the state court's job and unnecessarily run up legal defense costs and attorney fees, which is a source of pressure on Ostrander to pay.

Thus far, no lawyer has entered an appearance in the state court action on Ostrander's behalf or on behalf of "her entities." She is representing herself. In this case and in this legal context the relative status of the parties makes a difference. Respondents are a lawyer and his law firm, with the latter the state court plaintiff. Pigott, Ltd.'s prosecution of the complaint by Pigott certainly has costs, such as lost opportunity costs to work for other clients. But Plaintiff will not receive an invoice for legal fees every month or have to come up with a substantial retainer after even a cursory look at what must be defended. As an individual, Ostrander can technically represent herself. Based on this court's observation of her and her testimony at this hearing and in other of the matters in this court in which both she and Pigott, Ltd have been involved, she is not effectively capable of doing so with respect to this complaint. That is not unusual with *pro se* parties; unfortunately, the litigation chips must often fall where they may anyhow. But in the context of

evaluating whether post-petition litigation violates an individual's discharge, and in this case, the disparity in the parties' circumstances combined with the problematic form and substance of the complaint is a factor that adds to the coercion ledger.

The entities, including Stone Oak Investments, LLC and Stone Oak Market, Inc, cannot represent themselves in the state court. They must secure counsel to defend the complaint at the risk of default. No lawyer has entered an appearance on their behalf in the state court action and a motion for default judgment is pending. They have no known assets, or Pigott, Ltd. would have collected its consent judgment now, which is why he is after Ostrander. One might say so what, they are third parties whose debts to Pigott, Ltd. are not discharged and can be sued to collect them. But a default judgment on the Fifth Cause of Action, for example, where Pigott, Ltd. pretends it is not after Ostrander, necessarily impacts Ostrander as to discharged debts.

Paragraph 185 of the complaint seeks judgment against the entities "and their [unnamed] respective owners, shareholders, members, managers, directors, an/or officer" as a subterfuge to obtain judgment against Ostrander on the discharged debts. The testimony and the other averments of the complaint show that is Ostrander, as Respondents well-know. The Ninth Cause of Action seeking to pierce the corporate veil similarly seeks judgment against those entities' owners, *etc.* to hold them "personally liable" for actions of the entities. As explained, it could be pursued to seek such a remedy limited to post-petition actions. As filed, it does not do so, leaving Ostrander personally at risk with respect to discharged debts in a default setting.

Second, separating the discharge violation wheat from the non-discharge violation chaff has been nearly impossible because of the form of the complaint. It uses the albeit common practice in multi-count complaints of incorporating every prior paragraph of the complaint into every successive cause of action, causing each successive claim to carry all that came before and the last count to be a combination of the entire complaint.[17] Pigott, Ltd. fails in many instances to connect specific facts or events with the cause of action asserted. *See A.B. v. Hilton Worldwide Holdings Inc.*, 484 F.Supp.3d 921, 943 (D. Or. 2020) (a complaint is deficient where it fails to connect its factual allegations to the elements comprising plaintiff's claims such that it denies the parties adequate notice of the allegations supporting each cause of action). Certain of the multi-defendant claims, specifically the Sixth Cause of Action-Fraud and the Tenth Cause of Action-Civil Conspiracy as to "All Defendants", fail to specify which defendant is responsible for

---

[17] This practice is derisively described by some courts (although not so much in the Sixth Circuit) as "shotgun pleading." *E.g.* *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015); *DeGirolamo v. McIntosh Oil Co. (In re Laurel Valley Oil Co.)*, Case No. 05-64330, Adv. Pro. 12-6014 2012 WL 2603429, *3 (Bankr. N.D. Ohio July 5, 2012).

39

which act or omission. It *could be* Ostrander as to a pre-petition action that was discharged as to her, but that is not clear.

It is up to the state court to decide whether any particular complaint and claim passes muster under the Ohio Civil Rules and Ohio law. Even if it does, that is not the issue before this court. Rather the issue this court must address is whether the filing of Pigott, Ltd.'s complaint violates Ostrander's discharge as an act to collect a discharged debt as a personal liability, whether it survives in state court or not. Although framed in the procedural context whether a complaint violates applicable rules of civil procedure governing sufficiency of pleadings, the following problematic characteristics of pleadings like Pigott, Ltd.'s complaint are also relevant to the inquiry here:

> ● They are "calculated to confuse the 'enemy,' and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury [and which can violate a discharge injunction], can be masked…" *Weiland*, 792 F.3d at 1320.

> ● They "inexorably broaden the scope of discovery," which wastes party and judicial resources. *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018).

> ● They unfairly put responsibility on a defendant(s) to seek relief to clean up the mess, which in this case would be to clarify and determine that there are or are not claims that are brought against Ostrander and violate the discharge injunction. See *Barmapov v. Amuial*, 986    F.3d 1321, 1330 (11th Cir. 2021) (Tjoflat, J., concurring).

Finally, Pigott. Ltd. has dumped meritless and exaggerated claims into the state court complaint. The significance of doing so from the perspective of a discharge violation is that those claims and allegations must still be defended as a source of coercive pressure to pay up

Pigott, Ltd. already has a money judgment against Stone Oak, Investments, LLC, by its consent. It avers incorrectly that it has a lien against it. Yet in violation of fundamental principles of Ohio jurisprudence it seeks in the First, Second, Third and Fourth Causes of Action a second money judgment against Stone Oak Investments, LLC for a lot more money on the same debt(s). Pigott, Ltd. gratuitously throws Ostrander into the factual allegations regarding these claims to remind the state court and the jury that she did not pay Pigott, Ltd. either, even though it purports not to be trying to pursue or collect these same debts from her now. The nugget is planted. And the effort to obtain a second judgment on the same debts must be defended as the glaring vagueness of the Ninth Cause of Action exposes her to renewed

personal liability for judgments, and a second one in the case of Stone Oak Investments, LLC, on debts already discharged as to her.

The deepening insolvency claim set forth in the Fifth Cause of Action, without calling it such, is vague, conclusory, legally inadequate under Ohio law, duplicative and unnecessary. But it, too, must be untangled and defended.

In addition to the specific problematic causes of action already specified, the court finds that the practical, objective effect of the complaint overall is to coerce and pressure Ostrander to repay discharged debts. As such, it violates the discharge injunction in this case.

## B. Are Respondents' Violations of Ostrander's Discharge in Contempt of This Court Under _Taggart_?

Having decided that the acts of filing and pursuing the state court complaint(s) violate Ostrander's discharge on the grounds and to the extent explained, the court must decide whether those acts constitute contempt of this court under _Taggart_.[18]

Analyzing violations of the discharge injunction is necessarily fact specific, especially where violations are based on litigation in another forum. Like unhappy families, every potential discharge violation is a problem in its own way.

This case does not involve Respondents being unaware of Ostrander's discharge. Nor does it involve obviously problematic acts like post-petition garnishment of wages to satisfy discharged pre-petition debts. _E.g., In re Ragone_, 2021 WL 1923658 at *5-*6. This Chapter 7 case is now more than 10 years old. While not complex, the facts and actions that are the subject of Debtor's instant motion for contempt and the state court complaint(s) occurred many years ago. They are unique. Many parties are involved, including non-Debtor third parties who are for the most part fair game. Multiple bankruptcy cases involving some of those parties have intervened over the years, as has other state court litigation. There are also several issues of Ohio law raised that intersect with the scope of the bankruptcy discharge. The parties have not pointed out nor can the court find any controlling or even persuasive case authority that fairly predicts a result in this case. _See In re Orlandi_, 612 B.R. at 382-83 (action against pre-petition guarantor and debtor post-discharge not contemptuous due to case law split about whether it is a contingent claim without a post-petition right to payment).

---

[18] Respondents are Ostrander's creditor and its lawyer. The actions of creditor's counsel commonly result in joint and several liability for sanctions for contempt upon the creditor and its counsel, including as here when the creditor is a law firm. _E.g. In re Ragone_, 2021 WL 1923658 at *6.

41

Applying the objective standard of *Taggart*, the court finds that there was a fair ground of doubt about whether Respondents' actions in filing and pursuing the state court complaint(s) violated Ostrander's discharge. Pigott's understanding that he had successfully maneuvered around the parameters of the discharge injunction in the state court complaint(s) was not objectively unreasonable under the circumstances.

That said, the Supreme Court emphasized in *Taggart* that contempt is a "severe remedy" and that "principles of 'basic fairness requir[e] that those enjoined receive explicit notice 'of 'what conduct is outlawed.'" *Taggart*, 139 S.Ct. at 1802 (quoting *Schmidt. Lessard*, 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974)). In a way, *Taggart* represents the bankruptcy version of qualified immunity for creditors. Respondents now have "explicit notice" of what conduct around the state court complaint(s) is enjoined and best conduct themselves going forward accordingly.

## IV. <u>CONCLUSION</u>

Respondents' actions in filing an unsecured proof of claim in this case, recording the Mortgages on the 9136 Angola Road and 1120 S. Raab Road properties and giving Ostrander notices of the scrivener's error on the 1120 S. Raab Road Mortgage did not violate her discharge. Although the court finds that Debtor has established by clear and convincing evidence that Respondents' have committed violations of her discharge in filing and pursuing state court litigation against her, Ostrander has not met her burden of proving that those violations are in contempt of this court. The court will enter a separate order denying Debtor's motion for contempt, without prejudice.

# # #